IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

---

Bradley A Hoyt,
The Village, LLC,
a Minnesota Limited Liability Company,

        Plaintiff,

vs.

The City of St. Anthony Village, Mark Casey,
Jerry Faust, Breanne Rothstein, WSB & Associates, Inc.,
a Minnesota corporation, Stacie Kvilvang, Jay R. Lindgren,
and Ehlers & Associates, Inc., a Minnesota corporation.

        Defendants.

Court File No. 0:18-CV-02434
Judge Patrick J. Schiltz

**AMENDED COMPLAINT**
**JURY TRIAL DEMANDED**

---

For its claims against Defendants, Plaintiffs state and alleges as follows:

## INTRODUCTION

1.  This lawsuit seeks damages against the City of St. Anthony Village ("City") and its agents and representatives for actions defendants undertook to fraudulently induce the Plaintiff to purchase real estate in the City for $6,000,000 with specific representations of the City's desire to redevelop the real estate with new high density housing. The defendants' actions were in reality a part of the City's plans to remove a mobile home park to reduce the number of people of color and diversity living in the city.

2.  The Defendant City and its agents never intended to allow The Project to be approved. Instead, the Defendants intentionally induced The Village to incur the enormous costs to close the mobile home park in order to rid the City of low-income, multicultural citizens that the City deemed undesirable.

## PARTIES

3.     Plaintiff The Village, LLC, is a Minnesota limited liability company formed to acquire and develop the real property at 2501 Lowry Avenue in the City of St. Anthony Village in Hennepin County, Minnesota.

4.     Plaintiff Bradley A. Hoyt ("Hoyt") is the majority owner of The Village LLC and a resident of Minnesota.

5.     Defendant City of St. Anthony Village ("City") is a municipal corporation located in Hennepin County, Minnesota.

6.     Defendant Mark Casey is and was at all relevant times, the city manager for St. Anthony Village and a resident of Minnesota.

7.     Defendant Jerry Faust is and was at all relevant times the mayor of the City and a resident of Hennepin County.

8.     Defendant Jay R. Lindgren is a licensed attorney in the state of Minnesota and at all times relevant acted as an agent for the Defendant City.

9.     Defendant Breanne Rothstein ("Rothstein") is and was at all relevant times, a licensed professional engineer, the city planner for the City, an employee of WSB & Associates, Inc. and a resident of Minnesota.

10.   Defendant WSB & Associates, Inc. ("WSB") is a Minnesota corporation conducting business in Hennepin County with its main office located at 701 Xenia Ave., Suite 300, Minneapolis, MN 55416.  WSB has contracted with the City to provide professional engineering services.

11.   Defendant Stacie Kvilvang is a Certified Independent Professional Municipal Advisor (CIPMA) and at all relevant times was an employee of Ehlers & Associates, Inc. ("Ehlers"). Kvilvang, on behalf of Ehlers was an agent of the City providing financial consulting services.

12.   Defendant Ehlers is a Minnesota corporation that provides financial advisory services to municipalities. Ehlers at all times relevant was an agent of the City. Ehlers's principal executive office is located at 3060 Centre Pointe Drive, Roseville, MN 55113.

### JURISDICTION AND VENUE

13.   Venue is proper in the U.S. District Court for the District of Minnesota pursuant to 28 U.S.C. § 1391(b) because all of the events giving rise to the claims made in this complaint have occurred or will occur in this district and because Defendant City of St. Anthony Village is located in this district.

14.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 & 1343(4). This action arises under the Fourteenth Amendment to the United States Constitution, as well as 42 U.S.C. §§ 1983 & 3604.  The Court's jurisdiction also flows from 42 U.S.C. § 3613.

### FACTS

### THE FORMER RESIDENTS OF THE MOBILE HOME PARK

15.   By 2016, the mobile home park was dilapidated and in need of substantial and expensive maintenance.  Many of the homes in the mobile home park were older mobile homes, which could not be moved.

16.   At the time, the mobile home park was occupied by low-income residents of substantial diversity and color.  A submission to Hennepin County by the former mobile park

home owner in December 4, 2015, indicated there were 94 occupied homes.  As of June 2016, there were 95 occupied homes in the mobile home park.

17.   The City had long desired to close the mobile home park, both to rid itself of the low-income residents and to replace the mobile home park with an economically beneficial development.

18.   The residents were an ethnically diverse group, with a substantial number being non-white.  The December 4, 2015 submission to Hennepin County reflects at least 24 (26%) mobile home owners with Hispanic surnames and at least one with an Asian surname.  Upon information and belief, most of the remainder of the mobile home park's households were classified as white, non-Hispanic.

19.   In contrast, the population of the City is predominantly white.  Five-year summary data from the American Community Survey ("ACS") reflects 3,123 white households in the City as compared to only 132 Hispanic households.[1]

20.   The Department of Housing and Urban Development provides further data derived from the 2015 five-year ACS data, the Comprehensive Housing Affordability Strategy ("CHAS"), which indicates that the City had 3,725 occupied housing units.[2]

21.   Hispanic households comprise 4% and 5% of all households in Hennepin and Ramsey Counties respectively.[3]  While Hispanic households comprised less than 4% of units in the City, 26% of those displaced by the closure of the mobile home park were Hispanic.

22.   In total, the closure of the mobile home park displaced 18% (24 of 132) of the City's Hispanic residents while, at most, the mobile home park's closure displaced only slightly

---

[1] *Available at* http://factfinder2.census.gov/faces/nav/jsf/pages/searchresults.xhtml?refresh=t.
[2] *Available at* https://www.huduser.gov/portal/datasets/cp.html.
[3] The City is in both Hennepin and Ramsey Counties.

more than 2% (69 of 3,123) of the City's white, non-Hispanic population.[4]

23.   These statistics demonstrate that the closure of the mobile home park had a disproportionately adverse effect on Hispanic households in the City.

24.   The City could not close the mobile home park on its own, so Defendants instead sought to fraudulently induce a developer to accomplish the park closure for the City's benefit.

25.   In so doing, it was the City's intent to deny dwellings to persons, namely the residents of the mobile home park, on account of their income and race/national origin.

26.   The City's actions also had an undeniably disparate impact on racial minorities.

### THE INITIAL FALSE REPRESENTATIONS TO INDUCE PURCHASE

27.   After two months of negotiations, a letter of intent to purchase the real estate at 2501 Lowry Avenue was entered by the seller and Continental Property Group, which later assigned interests to purchase the property to The Village, LLC ("The Village").

28.   Prior to the signing of the Village Purchase Agreement, Brad Hoyt, Traci Tomas, and Phil Johnson met with Casey and Rothstein at the Village Pub restaurant on or about February 1, 2016 to discuss the potential Project.

29.   At this February 1, 2016 meeting, The Village's representatives met with Casey and Rothstein to advise them it had signed a Letter of Intent to purchase the property and to discuss development options. At this meeting, Defendants Casey and Rothstein acting as "City Staff" advised those present that the City wanted the developer to have maximum flexibility and would not place any limitations on the proposal.  At this meeting on February 1, 2016, Defendants Casey and Rothstein expressly stated that "the more density the better."

---

[4] Upon information and belief, the rental market in the Twin Cities metropolitan area at the time the mobile home park was closing was competitive, with average rents higher than those at the former mobile home park.

30.  On April 19, 2016 at 11 am, Casey and Rothstein again met with Traci Tomas ("Tomas") at the Applebee's' restaurant near city hall.  Casey and Rothstein had met with The Village representatives on more than one occasion. In these meetings prior to April 27, 2016, Casey and Rothstein specifically made the following false representations:

    A.  That the City supported the closing of the mobile home park by The Village and the redevelopment The Village proposed.

    B.  That the City supported the redevelopment of the property with a PUD

    C.  That the City supported the redevelopment with affordable housing.

    D.  That the City supported development far in excess of the comp guide plan recommendation.

31.  The Village relied on the truth of the representations made by the City by its City Manager Casey and its City Planner Rothstein when The Village entered a purchase agreement to buy the property for $6,000,000. Lowry Grove Partnership ("LGP"), as the former owner and seller of the Property, The Village entered into a valid and binding Agreement for Purchase and Sale dated April 27, 2016 (the "Village PA").

32.  The Village specifically asked what limits applied to the design of the PUD. The staff's instruction was that they did not want to constrain the design and were not imposing any limits. Rather, the staff requested that The Village determine the maximum number of units that could work on the site and the City would determine whether the infrastructure could handle that level of units or whether infrastructure improvements would be required. Provided that infrastructure needs were met, the City informed The Village that the number of units would not be an issue.

33.  It was that direction that led The Village to provide its initial maximum density design of nearly 1,000 units. To be clear, The Village never submitted a formal application for approval of a redevelopment including approximately 1,000 units, but it did discuss the design so that staff could analyze whether the existing infrastructure could service 1,000 units. Building on those initial meetings and the preliminary maximum design, staff outlined its intended approach in an April 26, 2016 e-mail. In early May 2016, City staff provided The Village with its preliminary analysis of the maximum build scenario.

34.  In June of 2016, Plaintiff The Village, LLC ("The Village"), acquired the land at 2501 Lowry Avenue NE in the City of St. Anthony Village ("City") for $6,000,000 to redevelop the property from its then use as a mobile home park to a new high density residential development of 837 residential units ("The Project").  Before making the purchase, The Village and its agents met with City officials and employees. The City's manager, Mark Casey ("Casey"), and its city planner, Breanne Rothstein ("Rothstein"), made specific representations that the City would allow, encourage, and support The Project, which included closure of the mobile home park and construction of over 800 (837) high density residential units.  It has been discovered that the City and its employees and agents conspired and lied to The Village and its representatives.

35.  Since nearly any level of high density residential units on the 15.4 acres, would exceed the threshold for a mandatory Environmental Assessment Worksheet ("EAW"), The Village prepared a sketch plan submittal that included preliminary information necessary for the EAW process. This preliminary plan showed 5 buildings on the 15.4 acres that would contain 300 senior living units and 500 apartments along with 37 two-story, for sale townhomes. At the

time, The Village was proposing approximately 90 of the units would meet the federal affordable housing standard.

36.  A hearing on the sketch plan was held before the Planning Commission on October 24, 2016. The Planning Commission did not offer any comments on the sketch plan and most specifically did not suggest that the development must be no more than 40 units/acre.

37.  Based on the sketch plan submittal, the City had an EAW prepared to understand the risk of significant environmental impacts of 837 units of residential housing added to the area. In the EAW and its Record of Decision on the EAW (ROD), the City repeatedly emphasized the proposed project's consistency with the City's Comprehensive Plan and compatibility with the surrounding neighborhoods.  As a result of the City's assurances and support, the cost of the EAW was paid for by The Village.

38.  In late 2016 the city council was presented with the 837 unit plan at a public hearing and issued no negative comment. On November 28, 2016, the City Planner Rothstein completed and submitted an EAW. In January of 2017, the City approved Rothstein's EAW that found no negative impact, no requirement for an Environmental Impact Study ("EIS"), and submitted it to the Environmental Quality Board.

39.  The City then stated that "The project area is zoned as single family and would need to be rezoned as Planned Unit development/Multi-Family Residential. *The planned development does fit with the general vision outlined for the property in the Comprehensive Plan* **and includes units of affordable housing."**

40.  Conspicuously absent in the EAW is so much as a hint that the proposed 837 units (54 units/acre) was not consistent with "orderly development" or that the Comp Plan mandated that the project be limited to 40 units/acre. To the contrary, the Record of Decision (ROD)

8

adopted by the City discusses four factors relating to potential environmental effects. With respect to environmental effects and mitigation measures related to zoning and land use, the ROD notes that "the project fits within the spirit of high density residential zoning" and the "land use is compatible with the Comprehensive Plan" but the density proposed is greater than the Comprehensive Plan's description of High Density Residential.

41.   The ROD concludes that "the proposed project **does not** have the potential for significant environmental effects."

42.   Further, the City's express responses to the Metropolitan Council's questions on the EAW relating to the proposed density repeatedly emphasize that the City's response will be to change the language of the updated Comprehensive Plan to make the plan consistent with the proposed project.

43.   The EAW was presented to the City Council on February 14, 2017, for a determination of whether an environmental impact statement was necessary. The City Council voted for a negative declaration on the need for an EIS. In discussing comments on density, Mayor Faust noted, "The density for this proposal will be similar to Silver Lake, which is still not completed as there are still a few lots yet to be developed."

44.   In February 2017, the City staff flagged stormwater management as an area of concern. The Village and its technical team met with the staff to understand the stormwater concerns and system limitations. At no point during the discussions did staff identify any further issues or suggest that the project was not consistent with "orderly development" or was incompatible with surrounding uses or otherwise take issue with the plan that had 54 units/acre.

45.   To address the stormwater limitations of the City's systems, which only permitted an outflow of 6.1 cubic feet per second of rainwater, The Village determined that it needed to

revise its development. Ultimately, it determined that the only way to address the stormwater management issues was to reconfigure the project. Revised layouts were discussed with City staff on March 20, 2017. Again, City staff made no suggestion that the proposed density was inconsistent with "orderly development" or incompatible with surrounding uses. Staff did not raise any issues with the plan that had 54 units/acre.

46.   When the staff made clear that the greater height was unacceptable (with no discussion of a 40 units/acre limit) and the community provided significant push back on height, The Village determined that it needed to acquire the Bremer site in order for the project to be viable. In mid-April The Village advised the City that is was exploring the acquisition of the Bremer site.

47.   On May 2, 2017, the City Planner provided written notification of what would be needed in the applications. This letter is the first time that City staff suggested a Comp Plan amendment was necessary if the development had more than 40 units/acre rather than addressing the density in the 2040 Comp Plan as stated in the ROD.

## THE RESIDENTS SUE THE VILLAGE

48.   Under The Village PA, the closing date of the sale was to be "held at a date, time, and place identified by Buyer and Seller, which date shall be on or before the later of (i) June 11, 2016; or (ii) three (3) business days after the expiration of the Inspection Period…."

49.   On May 3, 2016, LGP and The Village identified June 13, 2016, as the closing date for the sale of the Property to The Village.

50.   On June 13, 2016, the closing took place consummating the real estate purchase by The Village for six million dollars ($6,000,000).

51.   Shortly thereafter in July 2016, The Village was sued by the residents of the mobile home park and Aeon, an affordable housing developer.

52.   That lawsuit cost The Village in excess of $1,000,000 in attorneys' fees and costs.

53.   The Village complied with the statute regarding the closure of the mobile home park and closed the park on June 30, 2017, relying on the representations made by the City through its City Manager Casey and City Planner Rothstein.

54.   From January 2016 through April 2016, Casey and Rothstein specifically and repeatedly represented that the City supported the closing of the mobile home park and The Village's proposed development of the property.

55.   Working with City staff, The Village refined its plan to meet its needs and what it had been led to believe was the City's vision. That work resulted in a concept plan, which City staff then used to prepare an EAW. The unit count used for the EAW was 54 units per acre density.

56.   Rothstein authored the Traffic Impact Study and EAW dated November 28, 2016, and charged The Village $39,688 (the traffic study was $18,286 and the EAW was $21,402).

57.   Rothstein certified and concluded that:

    a.   "The planned development **does fit** with the general vision outlined for the property in Comprehensive Plan and includes units of affordable housing.

    b.   "The project is proposed to construct approximately 837 units."

    c.   "Five multi-unit buildings will be constructed as part of the redevelopment. The tallest of the buildings will be 5 stories (56 feet). The total number of units within the buildings will be approximately 800 units. An additional 37 2- to 3-story townhome units will also be constructed."

    d.   "The land is currently zoned for Low Density Residential, but guided for High Density Residential in the City 2008 Comprehensive Plan. "In the Metropolitan Land Planning Act, the Comprehensive Plan controls in the event of a conflict and upon the request of the owner, **zoning must be**

11

amended to come into conformance with the Comprehensive Plan."

e. "The project area is zoned as single family and would need to be rezoned as Planned Unit Development/Multi-Family Residential prior to construction.

f. "The project will **not produce vapor plumes**."

g. "The construction and operation of the proposed site redevelopment is **not anticipated to involve processes that would generate odors**."

h. "Lighting within the project area will be consistent with the surrounding areas and will **not produce glare from intense lights**."

i. "The pipe and downstream system is capable of handling the increased sanitary flows proposed from the development, according to the City's sanitary sewer model."

j. "The screening method demonstrates that because this project has less than the benchmark AADT of 79,400 and does not involve or affect the 'Top Ten Intersections,' **a hotspot analysis is not needed**."

k. The traffic study concluded "Therefore, it is **not anticipated that the impacts will combine to create a cumulative potential effect**."

58. At all times relevant, the City retained WSB & Associates, Inc. ("WSB") as its engineering and planning consultant. Rothstein is an employee of WSB.

59. On January 19, 2017, WSB prepared and issued the City's Record of Decision on the Village, LLC Redevelopment EAW. It was sent to the Mayor and every member of the City Council.

60. In that Record of Decision, it contained the City's own conclusion that the land use proposed by The Village "is compatible with the Comprehensive Plan...."

61. The Record of Decision also contained recommendations and comments from the Metropolitan Council. The Metropolitan Council's Comment 4 states "Metropolitan Staff would recommend the additional 700 households and 1,800 population to the Transportation Analysis Zone (TAZ) #1263."

62.     In addition, The Metropolitan Council's Comment 6 states "The proposed development fits with the description of High Density Residential in Table 2-4 of the City of St. Anthony Village's Comprehensive Plan which includes descriptions of land use categories."

63.     In February 2017, City staff raised questions about storm-water management and explained the limits of the City's storm-water system. The Village responded by significantly redesigning The Project to include a park and significantly greater storm-water infrastructure. In turn—to accommodate the proposed park and the storm-water infrastructure—the revised plan called for a building identified as Building D to be 14 stories. The proposed height received significant negative feedback and was quickly abandoned.

64.     The Village looked for additional ways to revise its plan and entered into a purchase agreement to acquire the property at 2401 Lowry Avenue NE. With the additional land providing space for additional creativity, The Project was revised again to include a separate building to provide affordable housing, which The Village had committed to providing from its earliest concepts. This was the design set forth in the Applications.

65.     In the meantime, The Village was in discussions with Bremer to purchase 2401 Lowry Avenue to include it in the development and had engaged with Aeon and the Lowry Grove Residents Association in the court required mediation. After the Village entered into a purchase agreement for the Bremer property, it revised the project again to respond to community comments and concerns raised by staff. It submitted development applications on July 18, 2017 and staff deemed the applications complete.

66.     After submitting the Applications and after considerable negotiation, an agreement to settle the residents' lawsuit was reached based on the City's approval of the development as it had led the Parties to the residents' lawsuit to believe the City supported this

Settlement Agreement, which—among other things—put Aeon in control of the affordable housing building.

67.     As part of the settlement, the Plaintiff developed an inclusive and comprehensive plan aimed at addressing the concerns voiced by the residents over the lack of affordable housing. Plaintiff joined with a celebrated non-profit developer, AEON, and informed the city that they would be providing as many as 300 affordable housing units, 100 of which would be deeply affordable units to be developed by AEON. In subsequent meetings, Mayor Faust informed the Plaintiff and stated "he hated Aeon and that Aeon builds shit." He stated that AEON would never be allowed to build any affordable housing in the city.

68.     In June 2017, as the Park was being closed, Plaintiff had several conversations with the Chief of Police. The Police Chief made a request to Plaintiff that they not seek or allow RV rentals [which would deprive Plaintiff of substantial rental income] during the summer and fall as it would draw the state fair "roadies" to the project. The Police Chief stated to Plaintiff that these people were the "underbelly" of society they commit numerous crimes, such as, human trafficking, prostitution, violent crime and were a general nuisance placing a high load on his police department. Plaintiff, believing that the city was honoring their good faith commitment to approve the project at the upcoming city council meeting, obliged reluctantly.

69.     During early meetings, City staff requested that The Village determine the maximum density it could foresee so that the City could run feasibility reports.  Plaintiff asked about the 40 unit per acre limit and was told it did not apply and the Met Council desired maximum density.  Each of the Defendants herein has acted as the agent of the other Defendants with respect to the actions complained of herein.

**AFTER INDUCING THE PURCHASE AND TENANTS LEFT -
THE CITY FURTHERS THE CONSPIRACY TO DESTROY**

## PLAINTIFF'S REDEVELOPMENT

70.     On October 10, 2017, the City's council was to approve the long negotiated development plan. However, without notice to Plaintiff, or the public, Mark Casey presented a resolution to the City Council immediately before Plaintiff's item was to be heard. This resolution was passed by the Council without discussion or public notice and limited the development to 25 units per acre. The City Council then passed Resolution 17-070 a resolution denying The Comprehensive Plan Amendments, PUD Preliminary Development Plan/PUD Rezoning, and Preliminary Plat related to The Village, LLC Project Located at 2401 and 2501 Lowry Avenue.

71.     This last minute Resolution was an overt act by the Defendants to achieve the objective of their conspiracy to have The Village close the mobile home park to rid the City of the diverse residents at the sole cost of The Village and then deny any project proposed by The Village to build high density residential housing including affordable housing.

72.     The City's decision to deny Plaintiff's application was arbitrary and capricious because, among other reasons, the City's stated reasons were a pretext, were not applied evenly to similarly-situated developments and at least in part, were motivated by personal animus. In addition, it was the objective of the Defendants' conspiracy to rid the City of the diverse residents of Lowry Grove mobile home park.

73.     Upon information and belief, Defendants Casey, Faust and Rothstein took actions to lobby and contact members of the City Council to vote against the Plaintiff's proposal outside of the appropriate hearing process.

## THE DENSITY AND TIF UNDERSTANDINGS AND AGREEMENTS MADE

74.     On October 17, 2017, a meeting was held at the City's offices and attended by Mayor Faust, Jay Lindgren the attorney for the City, Michael Mergens, and Bradley A. Hoyt ("Hoyt") the majority member of Plaintiff, and a few other individuals.

75.     At the meeting, Hoyt stated the reality that for any development to be economically feasible with density limited to 25 units per acre Tax Increment Financing ("TIF") would be required and that Plaintiffs would need all of it.

76.     Jay Lindgren stated that the City would need 10% for the City's costs and Mayor Faust agreed that TIF was appropriate and would be available to Plaintiffs less the 10% for the City.

77.     From October 17, 2017 through the Spring of 2018, there were many meetings and communications between Hoyt and the Defendant City's representatives including but not limited to Defendant Faust and Jay Lindgren wherein the promised TIF was discussed. Plaintiffs incurred costs of over $1,000,000 during this period in carry costs, architectural and engineering fees, City Escrows and legal fees as well as property taxes. Plaintiff made The City aware that its burn rate was more than $5,000 per day and that time was of the essence. All of these costs were incurred in express reliance on the assurances made personally by Faust and the other council members as well as Rothstein.

78.     During January and February of 2018, there were multiple meetings and emails between Hoyt and representatives of the City including the City's attorney Jay Lindgren. On January 9, 2018, there was a meeting held with Jay Lindgren, Steven Schumeister, Faust, Rothstein and Hoyt to discuss Plaintiff's development project. In that meeting, Lindgren confirmed that the City was supportive of the project and that there were not any obstacles to obtaining the TIF.

79.     On January 29, 2018, Lindgren once again confirmed in an email to Hoyt that " I also want to confirm that we are on the same page."

80.     In the Spring of 2018, The City went through the motions of pretending to be working on a cooperative path to have Plaintiff's development come to fruition. For example, the City had engaged Defendant Stacie Kvilvang to ostensibly prepare a TIF analysis. Plaintiff was required to pay additional escrow deposits exceeding $100,000 as a condition of the city continuing to bring the project to approval. The project that was drawn pursuant to the instruction of Faust, Rothstein and the councilmembers and conditioned upon the granting of full TIF benefit was passed. The City was now required to create the TIF district and enter into a Developers agreement to provide the promised TIF.

## THE WORTHLESS SINGLE PAGE EHLERS MEMO ISSUED BY KVILVANG

81.     On May 22, 2018, the City published a work session packet containing a single page "Memo" from Kvilvang to Defendant Mark Casey regarding TIF that purportedly contains her entire analysis with a single line conclusion "Based upon our review of their development proformas, we are of the opinion that the projects could be developed without any TIF assistance from the City."

82.     Upon information and belief, Kvilvang's one page memo is the result of the City and its agents conspiring and directing the conclusion that the Plaintiff's project could be developed without any TIF. Kvilvang's one page memo is not a professional analysis based on any data or professional analysis other than directions from the City. In other words, "the fix was in" to kill Plaintiff's ability to develop the property the City had induced Plaintiff to purchase to achieve the City's objective to rid the City of the residents of Lowry Grove mobile home park.

83.     Robert Strachota, the president of Shenehon Company and holding the

certifications as a MAI, CRE, MCBA is an accredited expert in real estate valuation and real estate development, reviewed the Kvilvang one page memo. Although Strachota made numerous attempts to discuss Kvilvang's one page analysis with her, Kvilvang did not return calls or respond. On May 29, 2018, Strachota sent the City Manager Casey a memo citing a number of deficiencies and errors in Kvilvang's analysis.

### DEFENDANTS' ACTIONS CREATE A LACK OF AFFORDABLE HOUSING

84.     The City's conduct in this case is part of a broader plan/policy to restrict the availability of affordable housing in the City.

85.     The most recent CHAS data shows that there are 490,195 households in Hennepin County.  Of those, 381,945 are white, non-Hispanic households.  This leaves 108,250 minority households (20,860 of which are Hispanic households).  Of those minority households, 36,200 are renter households with income less than 50% of AMI and with at least one identified housing problem.[5]

86.     Stated differently, only 8.9% (33,880 households) of all white, non-Hispanic households are renters with very low income (defined as less than 50% AMI) with at least one HUD identified housing problem.  By contrast, 35.9% of the Hispanic households and 33.4% total minority households meet the same criteria.[6]

87.     Thus, Hispanic households within Hennepin County need sound rental housing, which is affordable to a very low income household, at a rate over 4 times that of white, non-Hispanic households.  Similarly, minority households need sound rental housing, which is

---

[5] The four "housing problems" defined by HUD are:  (1) housing unit lacks complete kitchen facilities; (2) housing unit lacks complete plumbing facilities; (3) household is overcrowded (defined as more than one person per room); and (4) household cost is a burden (where monthly housing costs, including utilities, exceed 30% of monthly income).  A household is considered to have a "housing problem" if it has one or more of these problems.

[6] Data compiled from the CHAS data.  *Available at* https://www.huduser.gov/portal/datasets/cp.html.

affordable to a very low income household, at a rate of over 3.75 times that of white, non-Hispanic households.

88.     2015 HUD CHAS data reflects 500 total renter households in the City with incomes at or below 50% of the area median income, paying more than 30% of their income for housing.  Of those 500 renter households, 355 were severely cost burdened, paying more than 50% of their income for housing.[7]

89.     The City's 2008 Comprehensive Plan, which is currently in effect, identified the mobile home park as the City's "major source of affordable housing for population with incomes less than 50 percent of the community median."

90.     The City's conduct, in effecting the closure of the mobile home park and in stymying the redevelopment of the site with affordable housing, has had a disparate impact on racial minorities, who statistically have a greater dependence on low-income housing than the non-protected population.

91.     Moreover, it was known to the City that the former mobile home park residents had the opportunity to return to the City once the development of the site was completed.  By preventing the redevelopment of the site, Defendants have deprived the former residents of that ability.

92.     The TIF financing would also further have decreased the housing cost for renters at the site to be developed by Aeon.  Such a reduction would have dramatically impacted those with extremely low income.

**COUNT I: AGAINST CASEY, ROTHSTEIN, AND THE CITY**
**FRAUD/MISREPRESENTATION AND FRAUD IN THE INDUCEMENT OF**
**PURCHASE AGREEMENT**

---

[7] *Available at* https://www.huduser.gov/portal/datasets/cp.html.

93.     Plaintiff restates and reasserts the allegations of paragraphs above as if more fully set forth herein.

94.     That Defendants Casey, Rothstein, and the City had a duty to provide to Plaintiff all material facts concerning the transaction. Defendants knew or should have known that they were supplying false information that Plaintiff used in its deliberations on buying the real estate and mobile home park. The Defendants withheld material information to keep the City's true intentions a secret from Plaintiff.

95.     That Defendants failed and/or refused to disclose material facts concerning the transaction and such facts include, but are not limited to the fact:

A.     That the City wanted Plaintiff to close the mobile home park at the Plaintiff's expense for the City to rid the City of the low income residents of color and diversity.

B.     That the City could not close the park by using its power of eminent domain.

C.     That the City had no intention of allowing density of more than 25 units per acre for The Village development.

D.     That the City would use density as its basis to deny The Village's project thereby insuring that affordable housing would not be built.

E.     That the City, contrary to its own public statements, did not want affordable housing for those residents of the Lowry Grove Mobile Home Park.

F.     That the City and the Mayor considered and wanted a different developer to have the development opportunity on the Plaintiff's real estate.

96.     These representations were false and the nondisclosures were made with the intention that Plaintiff would rely on them and Plaintiff did reasonably rely on them in purchasing the property, and Plaintiff was induced to act and enter the transaction.  Both Casey

and Rothstein failed or intentionally refused to disclose the foregoing and other material facts.

97.     By reason of the foregoing facts, Plaintiff has been damaged in an amount yet to be determined with greater certainty at trial of this matter but believed to exceed $50,000.00.

## COUNT II: CIVIL CONSPIRACY AGAINST CITY, FAUST, CASEY, KVILVANG, EHLERS

98.     Plaintiff alleges the foregoing allegations herein.

99.     Defendants City, Faust, Casey, Rothstein, Lindgren, WSB, Kvilvang and Ehlers agreed to act in concert and were complicit in wrongfully and illegally destroying Plaintiffs' property rights to develop Plaintiff's real estate located in the City of St. Anthony Village.

100.     The Plaintiffs were damaged and harmed by Defendants City, Faust, Rothstein, WSB, Kvilvang and Ehlers conspiracy to commit an unlawful act and to accomplish a legal act by illegal means by fraudulently inducing The Village to purchase the property and taking intentional actions to interfere with and destroy the Plaintiffs' rights to develop the real property.

## COUNT III: VIOLATION OF U.S.C. § 1983

101.     Plaintiffs allege the foregoing allegations as set forth herein.

102.     Acting under the color of statute, ordinance, regulation, custom, or usage of the State of Minnesota, the City has subjected the Plaintiff and Hoyt, a citizen of the United States, to a deprivation of his rights, privileges, and immunities secured by the Constitution and laws, specifically his equal protection rights secured by the Fourteenth Amendment to the United States Constitution.

103.     The City knew or reasonably should have known that their actions would violate Plaintiffs' equal protection rights as clearly established by the Fourteenth Amendment to the United States Constitution.

104.    Pursuant to 42 U.S.C. § 1988, the Civil Rights Attorneys' Fee Awards Act, Plaintiffs' are entitled to an award of their attorneys' fees and costs as a direct result of the public nature of the City's actions.

## COUNT IV:  VIOLATIONS OF THE FAIR HOUSING ACT

105.    Plaintiffs reallege the foregoing allegations as set forth herein.

106.    Any persons injured by a discriminatory practice which is prohibited under 42 U.S.C. §§ 3610 & 3613, including Plaintiffs, have standing to bring a lawsuit.

107.    Prior to its closure, the mobile home park provided affordable housing to residents of the City and had a population that was substantially more diverse than the general population of the City.

108.    The City wanted the mobile home park closed to rid the City of low income residents of color and diversity.

109.    The City, Casey, and Rothstein defrauded Plaintiffs, manipulating them to effect the closure of the mobile home park and thus ridding the City of the low income residents of color and diversity.

110.    By and through its actions, the City, Casey, and Rothstein engaged in disparate treatment of the former residents, which violated the Fair Housing Act.

111.    These actions, flowing from City policy, also had a disparate impact on the former residents of the mobile home park, a substantial portion of which were racial minorities.

112.    Once the mobile home park was closed, Defendants further violated the Fair Housing Act by depriving Plaintiffs the ability to construct the planned affordable housing.

113.    This denial had a discriminatory effect, by preventing the construction of low-income housing in the City, which has a disparate impact on minorities.

114.    Due to Defendants' fraud committed against Plaintiffs, there is no proper justification nor burden shifting available to rebut Plaintiffs' prima facie case.

115.    As a result of Defendants' discriminatory conduct, Plaintiffs have been damaged in an amount to be determined at trial in this matter, but reasonably believed to exceed $50,000.

116.    Pursuant to 42 U.S.C. § 3613(c), Plaintiffs are entitled to an award of their attorneys' fees and costs incurred in this matter.

**WHEREFORE,** Plaintiffs The Village, LLC, and Bradley A. Hoyt pray for judgment against the Defendants jointly and severally as follows:

1.    For a money judgment in an amount greater than $50,000;

2.    Granting Plaintiffs judgment on their amended complaint.

3.    For a jury trial of all issues so triable.

4.    An award of Plaintiffs' attorney's fees, costs, and disbursements.

5.    For such and other further relief as to the Court is just and equitable.

Date:  September 13, 2018

**SKOLNICK & JOYCE, P.A.**

By: _____

William R. Skolnick   #137182
wskolnick@skolnickjoyce.com
527 Marquette Avenue, Ste. 2100
Minneapolis, MN  55402
(612) 677-7600
**ATTORNEYS FOR PLAINTIFF
THE VILLAGE, LLC**