IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Bradley A. Hoyt, The Village LLC, a Minnesota Limited Liability Company,<br><br>        Plaintiffs,<br><br>v.<br><br>The City of St. Anthony Village, Mark Casey, Jerry Faust, Breanne Rothstein, WSB & Associates, Inc., a Minnesota corporation, Stacie Kvilvang, Jay R. Lindgren, and Ehlers & Associates, Inc., a Minnesota Corporation,<br><br>        Defendants. | Case No. 0:18-cv-02434-PSJ-ECW<br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS CITY OF ST. ANTHONY VILLAGE, MARK CASEY, AND JERRY FAUST'S MOTION FOR JUDGMENT ON THE PLEADINGS** |

## INTRODUCTION

In June 2016, The Village LLC ("The Village") acquired land at 2501 Lowry

Avenue ("the Property") in the City of St. Anthony Village ("The City").[1] The Village

later submitted two consecutive development applications for the Property, the

---

[1] Although Plaintiffs allege that "The Village entered into a purchase agreement to buy the property" (Am. Compl. ¶ 31), an allegation taken as true for purposes of this motion, the Minnesota Court of Appeals has recognized that the purchase agreement was between a non-party to this suit, Continental Property Group LLC, and the site's prior owner. *Aeon v. Lowry Grove P'ship, LLP,* No. A16-1755, 2017 WL 1861780, at *1 n.1 (Minn. App. May 8, 2017).

second of which the City approved.[2] Instead of starting construction, Plaintiffs started a lawsuit.

Plaintiffs' claims lack merit and should be dismissed. Plaintiffs' federal claims are simply not supported by the pleaded allegations. Plaintiffs allege that Defendants deprived Plaintiffs of equal protection, without ever disputing the rationality of the City's actions or alleging that a party similarly situated in all relevant respects received favorable treatment. Plaintiffs also allege that defendants violated the Fair Housing Act ("FHA"), but fail to plead essential facts. Although Plaintiffs closed the manufactured home park located on the Property and the City approved The Village's application to build 430 housing units there, the Amended Complaint's disparate-impact analysis focuses on the alleged impact of Plaintiffs closing the park and completely ignores the City Council's approvals.

Plaintiffs' state law fraud and conspiracy claims are similarly devoid of merit. Plaintiffs claim to have relied on positive but false statements by two or three individuals related to the outcome of future decisions that are delegated by statute to the City Council. Minnesota law makes such reliance unreasonable as a matter of law. Moreover, if any person should know that, it is Bradley Hoyt. The Minnesota Court of Appeals has rejected similar reliance-based claims brought by

---

[2] The City Council's resolution of approval, which was barely mentioned in the Amended Complaint, is Exhibit B to the City, Mark Casey, and Jerry Faust's (the "City Defendants") Answer to the Amended Complaint.

Hoyt, recognizing that such an "experienced real-estate developer and investor" cannot reasonably rely on non-final statements to his detriment. *Hoyt v. Piper Jaffray & Co.*, No. A07-1737, 2008 WL 3289722, at *2-3 (Minn. App. Aug. 12, 2008). Without a valid tort claim, Plaintiffs have no civil conspiracy claim.

Since Plaintiffs' federal and state claims fail as a matter of law, this case should be dismissed with prejudice.

## FACTUAL BACKGROUND

Plaintiffs claim that Defendants conspired to induce Plaintiffs to purchase the Property, and then conspired to ensure that Plaintiffs could not develop the Property. The City Defendants intend to vigorously contest these allegations. But even if accepted as true, Plaintiffs' allegations and public documents demonstrate the flaws in that narrative. Plaintiffs began speaking with some of the Defendants about the potential development only *after* signing a letter of intent to purchase the Property. They requested the City Council to approve the most discretionary kinds of approvals. And, crucially, the City ultimately approved Plaintiffs' second development application. This more complete factual narrative shows the extent to which Plaintiffs' claims lack merit.

## I.    The Village purchases the Property before obtaining development approvals from the City Council.

In June 2016, the Property was occupied by a manufactured home park. (Am. Compl. ¶ 16.) Although zoned as Single Family Residential, the City's 2008

Comprehensive Plan had reguided the Property as High Density Residential. (Answer, Ex. B, Resolution 18-030 [Doc. #17-2].)[3]

Plaintiffs allege that the City "sought to fraudulently induce a developer" to close the park. (Am. Compl. ¶ 24.) The first alleged inducement-related interaction between Plaintiffs and any Defendant concerning the Property occurred on February 1, 2016. (*Id.* ¶¶ 28-29.) By this time, however, Plaintiffs or their alleged predecessors in interest had already engaged in *months* of negotiations with the Property's owner and signed a letter of intent to purchase the Property. (*Id.* ¶ 27.) Neither a City Council Member nor the Mayor was allegedly present at this February 1 meeting. Instead, the sole City attendees at this meeting were City Manager Mark Casey and City Planner Breanne Rothstein. (*Id.* ¶ 28.) Similar meetings between representatives of The Village, Casey, and Rothstein allegedly occurred over the next few months. (*Id.* ¶ 30.)

On April 27, 2016, The Village entered into a valid and binding agreement to purchase the Property (*id.* ¶ 31), and on June 13, 2016, The Village purchased the Property (*id.* ¶ 50).

---

[3] The Comprehensive Plan is the City's "guiding document, approved in 2008, and reviewed in accordance with State Statute by the Metropolitan Council." (Answer, Ex. B, Resolution 18-030 [Doc. #17-2].)

## II.    The Village submits an initial sketch plan of its proposed development.

After purchasing the Property, The Village provided the City with a sketch plan of a development project. (Am. Compl. ¶ 35.) A sketch plan is "considered a partial, incomplete application prior to formal submittal of the complete application and schedule of hearings," presented by a planned unit development ("PUD") applicant. City Code § 152.209(B); *see also id.* § 152.201 (defining "sketch plan"). The sketch plan had a proposed density of 54 units per acre. (Am. Compl. ¶¶ 35, 45, 55.)

Rothstein used this sketch plan to prepare an Environmental Assessment Worksheet ("EAW") for the development project. After the EAW process concluded (*see id.* ¶ 38), The Village and City addressed environmental contamination on the Property. The City Council adopted Resolution 17-037, approving grant applications for an environmental cleanup. (Affidavit of John M. Baker in Support of Defendants City of St. Anthony Village, Mark Casey, and Jerry Faust's Motion for Judgment on the Pleadings (hereinafter "Baker Aff."), Ex. 1, Resolution 17-037.) That resolution states that the City "had not yet received, or acted, on development applications" for the Property, and that the City "reserves all right to approve, deny, or modify any such applications." (*Id.*)

III.   **The Village submits a first development application, which includes requests to amend the City's Comprehensive Plan.**

In early May 2017, Plaintiffs received written notification of the formal development application requirements. (Am. Compl. ¶ 47.) This included notice that any proposed density greater than 40 units per acre would require an amendment to the City's Comprehensive Plan. (*Id.*)

Based on community responses to the sketch plan, The Village "determined it needed to acquire" a neighboring property located at 2401 Lowry Ave (the "Bremer Property") to make the project viable. (*Id*. ¶¶ 46, 65.) In July 2018, The Village submitted preliminary development applications for both the Property and the Bremer Property ("first development application"). (*Id.* ¶ 65.) In its applications, The Village sought rezoning and comprehensive plan amendments to accommodate its proposed density and to change the guiding for the Bremer Property from Commercial to High Density Residential. (Baker Aff., Ex. 2, Resolution 17-070.)

In October 2017, the City Council adopted Resolution 17-070, denying The Village's first development application. (Am. Compl. ¶ 70; Baker Aff., Ex. 2, Resolution 17-070.) The resolution gave numerous reasons for the denial. Among others, the resolution explained that the proposal—which included a proposed density greater than 40 units per acre—did "not provide adequate light, air, and access to property." (Baker Aff., Ex. 2, Resolution 17-070.) Further, the proposal

did "not prevent overcrowding of land and undue concentration of structures." (*Id.*)

Resolution 17-070 also stated that a lower-density project would more likely achieve numerous public values, including:

- Less impact to the northern alley in terms of access and setbacks; . . .
- Better opportunities for green space and tree preservation within the development; . . .
- Height of buildings which is more consistent with surrounding land uses . . . . [; and]
- . . . the development of affordable housing at densities consistent with the Comprehensive Plan.

(*Id.*) Armed with this information, The Village prepared a second—successful—development application.

## IV.   The Village submits a second development application that the City approves.

By omission, the Amended Complaint manufactures the impression that the City never approved any of Plaintiffs' applications, thereby "destroying Plaintiffs' property rights to develop Plaintiff's [sic] real estate" in the City. (Am. Compl. ¶ 99.) While the Amended Complaint includes a cryptic reference to the project being "drawn pursuant to the instruction of Faust, Rothstein and the councilmembers" in the Spring of 2018 (*id.* ¶ 80), it neglects to mention that The Village submitted *and the City Council approved* a PUD rezoning application.

On January 26, 2018, Plaintiffs submitted a second Rezoning Request and PUD Preliminary Development Plan for the Property ("second development application"). (*See* Answer, Ex. A, Statement in Support of PUD Application ("Statement in Support") [Doc. #17-1].)[4] This second development application included a maximum density of 28 units per acre. (*Id.*) The City's Planning Commission held a public hearing on the second development application in February 2018, and recommended its approval. (Answer, Ex. B, Resolution 18-030 [Doc. #17-2].)

On March 27, 2018, the City Council considered the application. Linc Wilson of Kaas Wilson Architects spoke at length on behalf of the project. (Baker Aff, Ex. 3, 3-27-2018 St. Anthony City Council Meeting transcript at 2.) Wilson explained that the previous application "had many faults"—specifically mentioning that it had a "density of 40 units per acre, it was too tall, it was too close to the edge." (*Id.* at 5.) He went on to explain that the second development application included numerous changes, including a change in density to 28 units per acre. (*Id.*) After hearing from others and publicly deliberating about the application, the City Council adopted Resolution 18-030, approving The Village's second

---

[4] The Bremer purchase agreement expired before The Village submitted the second application, so Plaintiffs no longer proposed to develop the Bremer Property. (Answer, Ex. A, Statement in Support at 2 [Doc. #17-1].)

development application. (Answer, Ex. B, Resolution 18-030 [Doc. #17-2]; Baker Aff., Ex. 4, 3-27-18 City Council Regular Meeting Minutes.)

The Village also sought Tax Increment Financing ("TIF") for its project. Plaintiffs allege that they received representations regarding TIF from individuals working with the City, rather than from the City Council itself. (*See, e.g.*, Am. Compl. ¶ 77.)[5] In May 2018, the City included on the agenda for a City Council work session (where no votes are taken) The Village's TIF request. (Baker Aff., Ex. 5, 5-29-18 Work Session Agenda.) In advance of that meeting, the City published a packet that included a memo from Stacie Kvilvang to Casey regarding TIF. The memo observed that, among other things, the "projects could be developed without any TIF assistance from the City." (Am. Compl. ¶ 81); *see* Minn. Stat. § 469.175, subd. 3(b)(2)(i) (explaining that TIF is appropriate only if "the proposed development or redevelopment would not reasonably be expected to occur solely through private investment").

In the work session, The Village's TIF request was discussed with representatives of The Village, Kvilvang, and a consultant for The Village. (Answer, Ex. C, 5-29-18 City Council Work Session Minutes [Doc. #17-3].) In response to The

---

[5] Although Amended Complaint ¶ 80 could be misunderstood to suggest that the City Council's unreferenced PUD approval was "conditioned upon the granting of full TIF benefit," the actual resolution shows that it imposed no such condition. (Answer, Ex. B, Resolution 18-030 [Doc. #17-2].)

Village's "question on next steps, [The City Attorney] stated the applicant [could] withdraw [it]s request or formally request action from the [City] [C]ouncil." (*Id.*) Plaintiffs did neither—but instead brought this suit.[6]

## ARGUMENT

Each of Plaintiffs' causes of action fails as a matter of law. Plaintiffs' claims against the City Defendants should accordingly be dismissed.

### *Standard of Review*

Judgment on the pleadings should be granted "where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law." *Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009) (quotation marks omitted); *see* Fed. R. Civ. P. 12(c). In evaluating one of those pleadings—the Amended Complaint—the court uses the same standard as it does for a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Ellis v. City of Minneapolis*, 860 F.3d 1106, 1110 (8th Cir. 2017). A complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

---

[6] For this reason, any claims based on the requested TIF are not yet ripe. *See Missouri Soybean Ass'n v. E.P.A.*, 289 F.3d 509, 512 (8th Cir. 2002).

When ruling on a motion to dismiss, the court must "'accept as true the well-pleaded allegations'" in the complaint, and "draw all reasonable inferences in favor of plaintiffs." *Kelly v. City of Omaha, Neb.*, 813 F.3d 1070, 1074-75 (8th Cir. 2016) (quoting *Varga v. U.S. Bank Nat'l Ass'n*, 764 F.3d 833, 836 (8th Cir. 2014)). The court need not, however, accept as true wholly conclusory allegations. *Mickelson v. Cty. of Ramsey*, 823 F.3d 918, 923 (8th Cir. 2016). A complaint that merely "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" is therefore insufficient. *Ellis*, 860 F.3d at 1110 (quoting *Iqbal*, 556 U.S. at 678). If these insufficiencies cannot be cured by amendment, then the complaint should be dismissed with prejudice. *See Beck v. LaFleur*, 257 F.3d 764, 766 (8th Cir. 2001).

A court ordinarily does not consider matters outside the pleadings when ruling on a motion to dismiss. *See* Fed. R. Civ. P. 12(d). However, the court may consider "materials that are part of the public record." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (quotation marks omitted); *see also Missourians for Fiscal Accountability v. Klahr,* 830 F.3d 789, 793 (8th Cir. 2016) (noting "the authority of a court to take judicial notice of government websites"). The court also may consider "materials that do not contradict the complaint, or materials that are 'necessarily embraced by the pleadings.'" *Noble Sys. Corp. v.*

*Alorica Cent., LLC,* 543 F.3d 978, 982 (8th Cir. 2008) (quoting *Porous Media Corp.,* 186 F.3d at 1079).

Here, Plaintiffs' allegations in the Amended Complaint, the three public records attached to the City Defendants' Answer to it, and several other key public records establish that Plaintiffs' 42 U.S.C. § 1983 equal-protection claim, FHA claim, and state law fraud and conspiracy claims should be dismissed with prejudice.

## I.     Plaintiffs' equal-protection claim fails as a matter of law.

Plaintiffs allege that the City violated 42 U.S.C. § 1983 by depriving Plaintiffs of their "equal protection rights secured by the Fourteenth Amendment to the United States Constitution." (Am. Compl. ¶ 102.) The Equal Protection Clause "does not guarantee that all persons must be dealt with in an identical manner," but instead "simply keeps governmental decisionmakers from treating differently persons who are in all relevant aspects alike." *Walker v. Hartford Life & Accident Ins. Co.,* 831 F.3d 968, 976 (8th Cir. 2016) (quotation marks omitted). A state actor may accordingly "treat dissimilarly situated people dissimilarly without running afoul of the protections afforded by the clause." *Habhab v. Hon,* 536 F.3d 963, 967 (8th Cir. 2008) (quotation marks omitted).

In response to a properly pleaded equal-protection claim, courts must determine which level of scrutiny applies to the challenged state action. State action is reviewed under strict scrutiny only if it "burdens a fundamental right,

targets a suspect class, or has a disparate impact on a protected class and was motivated by a discriminatory intent." *New Doe Child #1 v. United States*, 901 F.3d 1015, 1027 (8th Cir. 2018). Otherwise, state action is subject to the "highly deferential" rational basis review. *DeCrow v. N.D. Workforce Safety & Ins. Fund*, 864 F.3d 989, 992 (8th Cir. 2017) (quotation marks omitted). Under that review, the challenged state action will be upheld unless it "was not rationally related to a legitimate government objective." *Koscielski v. City of Minneapolis*, 435 F.3d 898, 901 (8th Cir. 2006).

As explained below, Plaintiffs' Equal Protection Clause claim is a throwback to the era when conclusory pleading was sufficient to defeat a Rule 12 motion and to earn a federal forum for a garden-variety state court dispute. (*See* Am. Compl. ¶¶ 72, 102.) Making matters worse, instead of pleading facts with the established constitutional standards in mind, Plaintiffs have strung together assorted adjectives borrowed from doctrines outside of the governing equal-protection standards—"arbitrary and capricious," "pretext," uneven application, and "personal animus." (*Id.* ¶ 72.) As a result, Plaintiffs' Amended Complaint fails to state an equal-protection claim.

### A.    Plaintiffs failed to allege the requisite comparator.

Plaintiffs claim that the denial of their first development application was arbitrary and capricious because the City's stated reasons were not applied evenly to similarly situated developments. (Am. Compl. ¶ 72.) But Plaintiffs stop far short

of pleading facts showing that they were treated differently than persons "who are *in all relevant aspects* alike." *Walker,* 831 F.3d at 976 (emphasis added) (quotation marks omitted); *see also Robbins v. Becker*, 794 F.3d 988, 996 (8th Cir. 2015). The Eighth Circuit and this Court routinely dismiss equal-protection claims for failure to adequately plead that a person similarly situated in all relevant respects received differential treatment. *See, e.g.*, *In re Kemp*, 895 F.3d 900, 909-10 (8th Cir. 2018); *Hager v. Arkansas Dep't of Health*, 735 F.3d 1009, 1015 (8th Cir. 2013); *L.L. Nelson Enters., Inc. v. Cty. of St. Louis, Mo.*, 673 F.3d 799, 807 (8th Cir. 2012); *Greene v. Gassman*, No. 11-CV-0618 (PJS/TNL), 2012 WL 748374, at *5 (D. Minn. Mar. 6, 2012) ("This [equal protection] claim fails because [the plaintiff] has not alleged that he is similarly situated in every material respect to the white males with whom he is comparing himself."), *aff'd* 489 Fed. App'x 997 (8th Cir. 2012).

In the land-use context, one function served by this requirement is to relegate to state court disputes about whether dissimilar entities are dissimilar enough to warrant different treatment. *See, e.g.*, *Koscielski v. City of Minneapolis*, 393 F. Supp. 2d 811, 814-15 (D. Minn. 2005) (relying on this requirement to reject equal-protection claim that city's restrictions on gun dealership locations were more restrictive than on any other business), *aff'd* 435 F.3d 898 (8th Cir. 2006); *Caswell v. City of Bloomington,* 430 F. Supp. 2d 907, 913 (D. Minn. 2006) (relying on this element to reject equal-protection challenge to zoning ordinance's

treatment of plaintiff's property differently than others where identical risks were present), *aff'd* 214 Fed. App'x 634 (8th Cir. 2007). Since Plaintiffs' Amended Complaint fails to even recognize this essential requirement, Plaintiffs' equal-protection claim should be dismissed.

### B.   The City's denial of the first development application was rationally related to legitimate government objectives.

Even if Plaintiffs were able to identify a development similarly situated in all relevant respects that received more favorable treatment, the challenged state action is supported by adequate rationale.

The challenged state action neither targets a suspect class nor burdens a fundamental right. Such facially neutral state action "is reviewed under strict scrutiny only if it can be proved that the law was motivated by a racial purpose or object, or . . . is unexplainable on grounds other than race." *Friends of Lake View Sch. Dist. Inc. No. 25 of Phillips Cty. v. Beebe*, 578 F.3d 753, 761 (8th Cir. 2009) (quotation marks omitted). This requires a showing that the decisionmaker "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

Plaintiffs failed to plausibly allege an intent to discriminate. Plaintiffs alleged a disparate impact on diverse residents of the mobile home park, but such a disparate impact "does not establish discriminatory purpose, even if the [City]

was aware of the likely impact." *See Shiraz Hookah, LLC v. City of Minneapolis*, No. 11-CV-2044 (PJS/JJK), 2011 WL 6950483, at *5 (D. Minn. Dec. 30, 2011). And Plaintiffs' few allegations regarding discriminatory intent are impermissibly conclusory. For example, Plaintiffs allege that "it was the City's intent to deny dwellings to persons, namely the residents of the mobile home park, on account of their income and race/national origin." (Am. Compl. ¶ 25; *see also, e.g.*, Am. Compl. ¶ 72.) These are exactly the type of "conclusory allegations" that the Eighth Circuit has repeatedly found to be insufficient "[t]o state a plausible equal-protection violation." *See, e.g., In re Kemp*, 894 F.3d at 910.

At most, the challenged state action is subject to the "highly deferential" rational-basis standard. *DeCrow*, 864 F.3d at 992. It easily satisfies such review; an issue that "courts may and often do resolve . . . on motions to dismiss." *Shiraz Hookah*, 2011 WL 6950483, at *5; *see also, e.g., Gilmore v. Cty. of Douglas, Neb.*, 406 F.3d 935, 937 (8th Cir. 2005) ("[B]ecause all that must be shown is any reasonably conceivable state of facts that could provide a rational basis for the classification, it is not necessary to wait for further factual development in order to conduct a rational basis review on a motion to dismiss." (internal quotation marks omitted)).

To start, the first development application's proposed density was inconsistent with the City's Comprehensive Plan, which "is the city's guiding

document." (Baker Aff., Ex. 2, Resolution 17-070.) Moreover, the proposal did "not provide adequate light, air, and access to property," did "not prevent overcrowding of land and undue concentration of structures," and did not promote "[o]rderly development and redevelopment." (*Id.*) The City also explained that a lower-density development would be more consistent with numerous public values, including, "Less impact to the northern alley in terms of access and setbacks; Less impact to the character of the neighborhood; . . . . [and] Better opportunities for green space and tree preservation within the development." (*Id.*) These considerations are not only rational, but also track the "required standards" set forth in the City Code section governing PUD proposals. *See* City Code § 152.204.

The Village can hardly say that these explanations are not rationally related to legitimate objectives. Even its own architect said as much, telling the City Council that this first proposed development "had many faults," including a "density of 40 units per acre," its height, and its closeness to the property's edge. (Baker Aff. Ex. 3, 3-27-2018 St. Anthony City Council Meeting transcript at 5.) Plaintiffs' equal-protection claim accordingly fails as a matter of law and should be dismissed with prejudice.

## II.     Plaintiffs' FHA claims fail as a matter of law.

Plaintiffs' second federal cause of action arises under the FHA. Plaintiffs allege that the City, Casey, and Rothstein engaged in disparate treatment of the manufactured home park's low-income, diverse residents. (Am. Compl. ¶¶ 108,

110.) Plaintiffs further allege that Defendants' conduct, "flowing from City policy, also had a disparate impact on the former residents of the mobile home park, a substantial portion of which were racial minorities." (*Id.* ¶ 111.) A plaintiff may bring either a discriminatory treatment or a disparate impact claim under the FHA. *See Tex. Dep't of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct 2507, 2513 (2015) ("*Inclusive Communities*"). Plaintiffs have failed properly to allege that the Defendants are liable under either theory.

### A.    The individual defendants are not subject to FHA liability.

As a preliminary matter, Plaintiffs cannot state an FHA claim against any of the individual defendants, because those defendants lacked the authority to deprive housing to Plaintiffs or their potential residents.

Under the FHA, it is unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). In order to be liable under Section 3604, the defendant "must be in a position to *directly effectuate* the alleged discrimination." *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 531 (5th Cir. 1996) (emphasis added); *see also, e.g.*, *Tuggles v. City of Antioch*, No. CO8-10914, 2009 WL 10668169, at *18 (N.D. Cal. Oct. 2, 2009) (explaining that under Section 3604's plain language, a defendant "must have at least been in a position of authority as it relates to the rental or sale of housing").

The *only* Defendant that was in a position to grant or deny The Village's development application was the City, acting through the City Council. As explained below in Section III.A., city managers and planning consultants lack authority to reguide or rezone property. That power instead resides with a city's "governing body"—here, the City Council—as a matter of Minnesota law. *See* Minn. Stat. § 462.351 *et seq.*; *see also* City Code §152.209(E). Similarly, only the City's housing and redevelopment authority in conjunction with the City Council could establish a TIF district. *See* Minn. Stat. §§ 469.174-.175. Plaintiffs' allegations that individual defendants made statements that influenced Plaintiffs' conduct are thus insufficient to state a claim against those individuals, since they were not "in a position of authority as it relate[d] to the rental or sale of housing." *Tuggles,* 2009 WL 10668169, at *18. Plaintiffs' FHA claim should proceed, if at all, against the City alone.

## B. Plaintiffs cannot establish that a City policy caused any alleged disparate impact.

Plaintiffs base their FHA claim, in part, on a disparate-impact theory. (*See* Am. Compl. ¶ 111.) The Supreme Court recently held in *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.* that "disparate-impact claims are cognizable under the Fair Housing Act." 135 S. Ct. at 2525; *see also* 24 C.F.R. § 100.500 (setting forth framework for analyzing disparate-impact liability). This disparate-impact liability is limited, however, by a

set of "cautionary standards." *Inclusive Communities*, 135 S. Ct. at 2524. These cautionary standards ensure that governmental entities are not "held liable for racial disparities they did not create." *Id.* at 2523.

To state a disparate-impact claim, a plaintiff must "allege facts *at the pleading stage* . . . demonstrating a causal connection [between a defendant's policy and a disparity]." *Ellis*, 860 F.3d at 1111 (emphasis added, other alterations in original) (quoting *Inclusive Communities*, 135 S. Ct. at 2523); *see also Khan v. City of Minneapolis*, No. 16-cv-3104 (PSJ/DTS), 2018 WL 948796, at *4 (D. Minn. Feb. 20, 2018), *appeal filed*. The Supreme Court has correctly recognized this as a "robust causality requirement." *Inclusive Communities*, 135 S. Ct. at 2523. Thus, "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Id.* A defendant may also defeat liability by establishing that any alleged policy was justified by a "valid interest." *Id.* at 2522. The *Inclusive Communities* pleading standard is "difficult . . . to meet." *Khan*, 2018 WL 948796, at *4. Plaintiffs have not done so here.

To start, Plaintiffs have failed to allege facts plausibly supporting a conclusion that any disparate impact was due to a City policy in the proper legal meaning of that term, let alone a City policy that resulted in an artificial, arbitrary, or unnecessary barrier to housing for a protected class. In *Inclusive Communities*,

the Supreme Court stated that "a one-time decision may not be a policy at all." 135 S. Ct. at 2523. The Eighth Circuit and courts in this district repeatedly dismiss cases in which the plaintiff alleges that their injury flows from isolated conduct. *See Ellis*, 860 F.3d at 1113 (rejecting plaintiffs' "attempt to bootstrap numerous 'one-time decision[s]' together in order to allege the existence of a City policy" (alteration in original)); *Khan*, 2018 WL 948796, at *5 ("Kahn's complaint does not say anything about 'management plans,' nor does it allege the existence of a policy or practice of forbidding landlords from renting to certain classes of tenants."); *Azam v. City of Columbia Heights*, No. 14-1044 (JRT/BRT), 2016 WL 424966, at *11 (D. Minn. Feb. 3, 2016) ("[A] single decision generally is not an identifiable policy capable of supporting a disparate impact claim."), *aff'd* 865 F.3d 980 (8th Cir. 2017). Just like the deficient pleadings in *Ellis*, *Khan*, and *Azam*, Plaintiffs' Amended Complaint lacks any factual allegations plausibly supporting a conclusion that the allegedly wrongful conduct resulted from a City policy, rather than, at most, a number of one-time decisions.

The City's 2008 Comprehensive Plan may be a policy, but guiding the park site so as to make it more attractive for private redevelopment cannot constitute a city policy that resulted in an "artificial, arbitrary, and unnecessary *barrier*[]" to housing, as is required to state a disparate-impact claim under the FHA. *Inclusive Communities*, 135 S. Ct. at 2524 (emphasis added) (quoting *Griggs v. Duke Power*

*Co.*, 401 U.S. 424, 431 (1971)). A barrier is a kind of stick, not a kind of carrot. Reguiding property in a way that broadens the kinds of rezoning requests that would be consistent with the Comprehensive Plan does not cause any form of housing to become prohibited. That is in part because a reguiding is not a rezoning, and in part because the nonconforming use doctrine provides a protected legal status for the continuation of prior lawful uses, even after a rezoning. *See SLS P'ship, Apple Valley v. City of Apple Valley,* 511 N.W.2d 738, 742 (Minn. 1994) (protecting mobile home park pads under the nonconforming use doctrine); Minn. Stat. § 462.357, subd. 1e (codifying a general right to continue a prior lawful use). And in any event, the 2008 reguiding was no barrier to *Plaintiffs*. The Village benefitted from the 2008 reguiding, because it enabled The Village to successfully apply for a development project with 28 units per acre without the need to ask for a comprehensive plan amendment.

Further, assuming arguendo that the City's one-time decision to deny The Village's first development application amounts to a "policy," the publicly available record shows that that one-time decision was justified. Disparate-impact liability "is not an instrument to force housing authorities to reorder their policies." *Inclusive Communities*, 135 S. Ct. at 2522. Rather, it "mandates the 'removal of artificial, arbitrary, and unnecessary barriers,'" to housing. *Id.* (quoting *Griggs*, 401

U.S. at 431). A defendant may therefore defeat a disparate-impact claim by providing a "valid interest served by their policies." *Id.*

The facts alleged by Plaintiffs do not plausibly suggest otherwise. Indeed, Plaintiffs' disparate impact claim ends after purporting to allege the existence of a disparate impact, without pleading facts that plausibly support the conclusion that the City's denial of the relatively-more-dense project was an artificial, arbitrary, or unnecessary barrier. This omission appears to be based on the novel and unprecedented notion that "due to Defendants' fraud committed against Plaintiffs, there is no proper justification nor burden shifting available to rebut Plaintiffs' prima facie case." (Am. Compl. ¶ 114.) But regardless of Plaintiffs' motive, *Inclusive Communities* and the decisions applying it show that such allegations are essential to defeat even a Rule 12 motion. *See, e.g., Ellis*, 860 F.3d at 1112-13. Without an artificial, arbitrary, or unnecessary barrier created by a city policy, there is no FHA claim after *Inclusive Communities*.

As explained above, the City's denial of The Village's first development application was based on numerous valid interests, including promoting orderly development consistent with the City's Comprehensive Plan, providing "adequate light, air, and access to property," and "prevent[ing] overcrowding of land and undue concentration of structures." (*See* Baker Aff., Ex. 2, Resolution 17-070.) The resolution specifically emphasized the ways that the problems arising from a

density of more than 40 units per acre could be mitigated if the density were reduced to 25 units per acre. (*Id.*) These rationale "can hardly be called artificial or arbitrary." *See Khan*, 2018 WL 948796, at *5. To the contrary, these are legitimate objectives outlined in the City's zoning code. *See* City Code § 152.204.

In other respects, Plaintiffs have not actually alleged a legally actionable disparate impact caused by a city policy, as is required by the "robust causality requirement" set forth in *Inclusive Communities*. The Supreme Court has made clear that "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Inclusive Communities*, 135 S. Ct. at 2523. Thus, a statistical disparity must be "sufficiently substantial" such that it raises "an inference of causation" between the alleged wrongful conduct and the alleged disparate impact. *See Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994-95 (1988) (plurality).

Focusing on their own decision to close the park, Plaintiffs allege that 26% of those displaced by the manufactured home park's closure were Hispanic, and that Hispanic households comprise less than 4% of households in the City. (Am. Compl. ¶ 21.) But even if the open and occupied manufactured home park were treated as the "before" condition, the City has approved The Village's request to develop up to 430 housing units in an area previously occupied by, according to Plaintiffs, 95 households. (*See* Answer, Ex. A, Statement in Support; Answer, Ex. B,

Resolution 18-030; Baker Aff., Ex. 6, Resolution 18-035; Am. Compl. ¶ 16.) In other words, there could be a more than fourfold increase in the number of housing units on the Property. Plaintiffs' Amended Complaint provides no explanation for how even with this increase in the number of housing units, a city policy would cause a sufficiently substantial impact on persons of a protected class.

And to the extent that there is a disparity, Plaintiffs are the legal cause of that disparity—not the City. Proximate cause under the FHA "requires some direct relation between the injury asserted and the injurious conduct alleged." *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1306 (2017) (internal quotation marks omitted)). The general tendency is thus "not to go beyond the first step" in causation." *Id.* (quotation marks omitted). Plaintiffs' conduct falls within that first step, not the City's, because it is Plaintiffs that purchased the Property and decided to redevelop it, making closure of the manufactured home park necessary. (*See* Am. Compl. ¶¶ 24, 53.)

Plaintiffs can establish neither the policy nor the causation prong of their disparate impact claim. The claim accordingly fails as a matter of law and should be dismissed with prejudice.

## C.   Plaintiffs have failed to allege sufficiently the discriminatory intent necessary for a disparate-treatment claim.

Plaintiffs' disparate-treatment claim likewise fails. When "an actor makes a decision based on reasons other than a protected category, there is no disparate-

treatment liability." *Inclusive Communities*, 135 S. Ct. at 2521. Accusing the City of intending to reduce the number of persons of color in the City (Am. Compl. ¶¶ 1, 2, 25), does not suffice under federal pleading standards; *at the pleading stage*, Plaintiffs must allege "facts suggesting that individuals protected under the FHA were treated inconsistently 'because of' a protected characteristic." *Ellis*, 860 F.3d at 1112 n.3 (quoting 42 U.S.C. § 3604(a)).

As explained above, Plaintiffs' allegations concerning discriminatory intent are wholly conclusory. Like other pleadings dismissed by this Court, Plaintiffs' Amended Complaint lacks specific allegations "leading to an inference of discriminatory intent." *See Azam*, 2016 WL 424966, at *7; *see also Hayes v. City of St. Paul, Minn.*, No. 16-cv-2926 (DWF/SER), 2017 WL 3382060, at *6 (D. Minn. May 18, 2017) (recommending dismissal of FHA claim because there was "nothing to suggest that [the] conduct as alleged was driven by discriminatory intent or animus"), *R&R adopted by* 2017 WL 3381844 (D. Minn. Aug. 4, 2017). And the statistical evidence that Plaintiffs rely on to support their disparate-impact claim does not "give rise to an inference that the [City] discriminated against" Plaintiffs or the manufactured-home residents "because of their race." *See Boykin v. Fenty*, 650 Fed. App'x 42, 44-45 (D.C. Cir. 2016) (per curiam).

Plaintiffs' FHA claim should accordingly be dismissed.

III.   **Plaintiffs' fraud-in-the-inducement claims are barred as a matter of law.**

Plaintiffs allege, in essence, that they were told by City agents that the City supported things that the City Council ultimately didn't approve. They characterize those statements as fraud in the inducement upon which they reasonably relied. Under longstanding principles of Minnesota law, Plaintiffs have no viable claim.[7] Discretionary decisions to grant a rezoning or reguiding request, and to approve TIF, have been delegated by statute to city councils to approve or deny through their votes, after procedural prerequisites of such a vote. For that reason, courts applying Minnesota law do not allow a plaintiff to use an earlier promise or other supposed representation by a city agent as the basis for a common-law or equitable claim when the city does not deliver on that representation. *See Plymouth Foam Prods. Inc. v. City of Becker, Minn.*, 944 F. Supp. 781, 785-86 (D. Minn. 1996) ("*Plymouth Foam Prods. I*") (claims against city), *aff'd Plymouth Foam Prods. Inc. v. City of Becker, Minn.*, 120 F.3d 153, 156-57 (8th Cir. 1997) ("*Plymouth Foam Prods. II*"); *see also City of Geneseo, Ill. v. Utilities*

_____

[7] Since Plaintiffs' state-law claims lack merit and "aris[e] from the same facts" as Plaintiffs' federal claims, this Court should exercise supplemental jurisdiction over those claims and dismiss them with prejudice. *See Shultz v. Buchanan*, 829 F.3d 943, 951 (8th Cir. 2016) (affirming district court's disposition of federal and related state-law claims in single order); *see also Martin-Trigona v. Champion Fed. Sav. & Loan Ass'n*, 892 F.2d 575, 578 (7th Cir. 1989) (stating that courts should exercise jurisdiction over and dismiss related state-law claims "in order to protect the defendant from being harassed in state court by frivolous filings").

*Plus,* No. 05–2689 ADM/JJG, 2007 WL 1027294 (D. Minn. Apr. 3, 2007) ("*Geneseo I*") (applying the same principles to claims against a municipal joint powers organization), *aff'd City of Geneseo v. Utilities Plus,* 533 F.3d 608, 615 (8th. Cir. 2008) ("*Geneseo II*"). Under these principles, Plaintiffs' reliance upon such supposed prior representations about City project support was unreasonable as a matter of law, barring Plaintiffs' fraud-in-the-inducement claims.[8]

None of this should surprise Hoyt (or his project-specific LLC, The Village). Eight years before the events described in the Amended Complaint began, Hoyt lost in the Minnesota Court of Appeals because of this doctrine. He sued an investment banking firm under a detrimental reliance theory because it provided an initial positive response, by letter, to his financing request but ultimately issued a formal denial. *See Piper Jaffray & Co.,* 2008 WL 3289722, at *1-2. Statutory provisions set prerequisites for a binding commitment for financing. *Id.* at *2. Thus, the earlier letter could not create a definite promise on which "Hoyt, who is an experienced real estate developer and investor," could "reasonably rely." *Id.* at *3.

---

[8] Even if Plaintiffs' supposed reliance were reasonable (it was not), the opening briefs filed by the remaining defendants demonstrate that the alleged fraudulent statements are not actionable statements of past or present fact. Although the Court need not reach the issue, the City Defendants join the remaining defendants' argument on whether the alleged statements are actionable.

### A. Plaintiffs' allegations regarding reliance-inducing representations by "the City" disregard the statutory requirements for city approvals.

Plaintiffs allege they were induced to purchase the property through representations by "the City," but all of the representations alleged to have predated the purchase agreement (April 27, 2016 (Am. Compl. ¶ 31)) or closing on the property (June 13, 2016 (*id.* ¶ 50)) are attributed to the City's non-voting manager (Casey) and the planner employed by the firm retained by the City (Rothstein). (*Id.* ¶¶ 29, 30, 32, 34.)[9] The alleged statements—made well in advance of Plaintiffs' actual development applications to the City—were about what the City allegedly "would allow, encourage and support" (*id.* ¶ 34), "wanted" or "supported" (*id.* ¶¶ 29, 30), or what would "not be an issue" (*id.* ¶ 32). Plaintiffs contrast these statements with the City Council's October 2017 denial of the first development application. (*Id.* ¶ 70.)[10]

---

[9] Plaintiffs' Amended Complaint occasionally makes reference to what "Plaintiff . . . was told" without identifying any particular person who supposedly made the statement, or indicating whether the statement was made before or after the purchase agreement or closing. (*See, e.g.*, Am. Compl. ¶ 69.) But even if the Court implies that some agent of the City was the person who "told" Plaintiffs such things, statements such as whether a 40-acre density limit would "apply" (*id.*), suffer from the same defects as those that are specifically attributed to an alleged City agent.

[10] The Amended Complaint does attribute statements to the City's EAW and the record of decision. (Am. Compl. ¶¶ 37-43.) But those representations are not alleged to have induced Plaintiffs to acquire the property, and for good reason: The date given in the Amended Complaint for Plaintiffs' closing date on the Property

As the decisions in *Plymouth Foam Products* demonstrate, the special status of public bodies under Minnesota law requires that the resolution of disputes with cities about supposed approval-related promises or representations relied on by a party must begin by examining the statutes prescribing the steps that cities must take to lawfully grant those kinds of approvals. *Plymouth Foam Prods. I,* 944 F. Supp. at 785; *Plymouth Foam Prods. II,* 120 F.3d at 156-57.

City managers and planning consultants have no statutory power to reguide or rezone property. Instead, the Minnesota Planning Act, Minn. Stat. § 462.351 *et seq.*, delegates the power to amend a comprehensive plan to a city's "governing body" (and then only after it has "received the recommendation of the planning agency" if 60 days have not passed since it was submitted to the "planning agency" for its recommendation). Minn. Stat. § 462.355. A "planning agency" is defined in Minn. Stat. § 462.352 and, as determined by City Code § 32.01, is the City's Planning Commission.

Similarly, the Legislature delegated the power to amend a zoning ordinance (such as through a rezoning) to a city's "governing body." Minn. Stat. § 462.357 subd. 2. Under Section 462.357, "a city is only to amend a zoning ordinance after notice has been given, a public hearing held, and either consents have been

---

(June 13, 2016 (*id.* ¶ 50)), predated the City Council's EAW approval (January of 2017 (*id.* ¶ 38), and negative declaration on the need for an EIS (February 14, 2017 (*id.* ¶ 43)).

obtained by a requisite number of affected residents or the approval is supported by the planning board and adopted by a majority of the city council." *Hans Hagen Homes, Inc. v. City of Minnetrista*, 728 N.W.2d 536, 543-44 (Minn. 2007). Because the creation of a PUD District is classified as a zoning amendment under the City Code, *see* City Code §§ 152.020(E), 152.242(E), these statutory steps applied to the City's power to approve or deny Plaintiffs' development application.

Plaintiffs' Amended Complaint does not claim that, before The Village purchased the Property, the City made any representations to it regarding TIF upon which it allegedly relied. The only representations regarding TIF alleged to have been false appear in paragraphs of the Amended Complaint regarding periods after October 2017. In any event, the power to take the steps necessary to provide TIF include creating a TIF district and approving a TIF plan. Minn. Stat. § 469.175, subds. 1 and 3. Before a TIF "district can be created, a municipality must make the necessary findings." *Matter of Condemnation by Minneapolis Cmty. Dev. Agency (MCDA), of Certain Lands in City of Minneapolis Situated in Dev. Dist. No. 57, S. Nicollet Mall,* 582 N.W.2d 596, 602 (Minn. App. 1998). By statute, such approval can occur only after a formally-noticed public hearing on the request before the relevant "municipality," with accompanying findings made as part of a "resolution of the governing body." Minn. Stat. § 469.175, subd. 3(c).

In short, the alleged prior representations about Plaintiffs' proposal that Plaintiffs claim to have relied upon to their detriment preceded statutory-mandated procedures for such approvals.

**B.     As a matter of law, Plaintiffs' reliance on the alleged representations was unreasonable.**

Binding precedent makes clear that Plaintiffs' reliance on any alleged misrepresentations was unreasonable as a matter of law. In *Plymouth Foam Products*, the plaintiff asserted contract, promissory estoppel, and fraud theories based on communications with a city's community development director, David Graning, about public financial support. *Plymouth Foam Prods. I,* 944 F. Supp. at 783, 785-87. This Court dismissed the claims, because "[o]nly the city council had [the] authority" to bind the city; not the city's community development director. *Id.* at 787. Affirming the dismissal, the Eighth Circuit recognized that the statutory requirements for a lawful approval were important "because the law and public records give other parties constructive notice of the powers and functions of such officers." *Plymouth Foam Prods. II,* 120 F.3d at 157. Regarding the fraud claim, the court explained:

> Plymouth has not shown its reliance on Graning's alleged representations was reasonable. Graning had no authority to bind the city, and [the plaintiff's manager] is conclusively presumed to be aware of this fact. Since he knew Graning could not bind the city and because his earlier dealings with the city and the Minnesota statutory code put him on notice of what was required to reach an agreement, it was not reasonable for [the plaintiff's manager] to rely on Graning's oral statements.

*Id.* (internal citation omitted).

Ten years later, in *City of Geneseo I* and *II,* this Court and the Eighth Circuit followed the same principles when dismissing a suit arising out of alleged representations made by the president of a joint powers entity formed by several local governments. After recognizing that the power to enter into contracts was possessed by the defendant joint power entities' board and not its president, this Court found that it was unreasonable as a matter of law for the plaintiff to have relied on the president's representations. *City of Geneseo I,* 2007 WL 1027294, at *12. Affirming, the Eighth Circuit held that "as a matter of law, [the plaintiff] could not have reasonably relied on [the president's] representations because he lacked authority to bind" the defendant joint powers entity. *City of Geneseo II,* 533 F.3d at 617.

Any reliance by these Plaintiffs is particularly unreasonable. As the Minnesota Court of Appeals recognized in 2008 when affirming a pretrial motion against Bradley Hoyt in *Hoyt v. Piper Jaffray & Co.*, Hoyt "is an experienced real estate developer and investor." 2008 WL 3289722 at *3. The court rulings that have arisen from his zoning applications demonstrate the extent of his experience dealing with Minnesota municipalities.[11] Indeed, having convinced the Minnesota

---

[11] *See, e.g., Cont'l Prop. Grp., LLC v. City of Wayzata*, No. A15-1550, 2016 WL 1551693 (Minn. App. Apr. 18, 2016) (unsuccessful challenge to denial of a PUD

Court of Appeals of the importance of elected officials making up their minds regarding a project *only after* the completion of a public hearing,[12] and having failed (as a matter of law) to convince the same court (in a different matter) that an informal letter regarding financing was a basis for reasonable reliance in advance of a final commitment pursuant to statute,[13] Hoyt is the last person who could successfully claim fraud in the inducement based on pre-hearing, pre-application statements by a city's staff member and a consulting planner in restaurants or meetings.

Just like the "sophisticated businessman and part owner of a multi-million dollar company" in *Plymouth Foam Products* was put on notice by "law, public records, and his experience" about "what was required to reach an agreement with the city," *Plymouth Foam Prods. II,* 120 F.3d at 157, Plaintiffs were put on notice by the same about what was required to secure a Minnesota city's approval of a large, complex real estate project. Plaintiffs were required to ascertain whether the City

---

concept plan and variance); *Cont'l Prop. Grp., Inc. v. Hassan Twp.,* No. A07-1600, 2008 WL 2651422 (Minn. App. July 8, 2008) (unsuccessful challenge to denial of a variance).

[12] A thorough description of the state and federal litigation filed by Hoyt's company regarding Minneapolis's denial of applications for an oversized project for the Loring Park area is found in Judge Nelson's final ruling in the federal case resulting from the denial. *See Hoyt v. Goodman,* No. 10-CV-3680 (SRN/FLN), 2012 WL 1094438, at *2-4 (D. Minn. Apr. 2, 2012).

[13] *Piper Jaffray & Co.,* 2008 WL 3289722 at *2-3.

Council had formally reguided and rezoned the property (and if so, with what conditions), or "act at [their] peril" in buying the Property in 2016. *Plymouth Foam Prods. I,* 944 F. Supp. at 785 (quoting *Morris v. Perpich,* 421 N.W.2d 333, 336 (Minn. App. 1988)).

This deficiency in Plaintiffs' fraud-in-the-inducement claim is not curable through more detailed pleading. There is not an exception to this doctrine available for Plaintiffs to squeeze within. It is fatal. Therefore, the Court should not only dismiss Plaintiffs' fraud-in-the-inducement claim, but also decline to grant Plaintiffs leave to replead it.

### C.   Plaintiffs' assertion that Defendants breached a supposed "duty to provide to Plaintiff all material facts concerning the transaction" is legally invalid.

Tucked into the Amended Complaint are odd sentences that appear to have been borrowed from a complaint in some falling-out between parties to a transaction. Plaintiffs allege that the City defendants "had a duty to provide to Plaintiff all material facts concerning the transaction," and "withheld material information to keep the City's true intentions a secret from Plaintiff." (Am. Compl. ¶ 94.) Plaintiffs also provide a non-exclusive list of such "material facts concerning the transaction." (*Id.* ¶ 95.) In the undisputed context of this case—involving not a "transaction" to which Plaintiffs and the City Defendants were parties, but necessary applications to the City for legislative land-use approvals, some of them

approved, and some denied, such allegations do not begin to state a claim upon which relief may be granted.

An essential step in analyzing failure-to-disclose claims is whether there was a duty to disclose. *Jane Doe 43C v. Diocese of New Ulm*, 787 N.W.2d 680, 688 (Minn. App. 2010) (stating that "we have not found a case involving nondisclosure that does not analyze whether there was a duty to disclose"). "Nondisclosure does not constitute fraud absent a 'legal or equitable obligation' to communicate facts to a particular person . . . [who] is entitled to the information." *L & H Airco, Inc. v. Rapistan Corp.*, 446 N.W.2d 372, 380 (Minn. 1989) (quoting *Richfield Bank & Trust v. Sjogren*, 244 N.W.2d 648, 650 (Minn. 1977)).

As a matter of law, the City Defendants did not have "a duty to provide to Plaintiff[s] all material facts" concerning any of the items listed in Amended Complaint paragraph 95 (or elsewhere). Except in circumstances plainly not present here, Minnesota cities only owe general duties to the public as a whole, which cannot provide the basis for a tort claim. *See Cracraft v. City of St. Louis Park*, 279 N.W.2d 801, 806 (Minn. 1979). There is no basis in Minnesota law to claim that the relationship between an applicant for land-use approvals and the city charged by law to respond to them is a confidential or a fiduciary one. Instead, cities have a "responsibility to regulate land use and development in the public's

interest." *Wedemeyer v. City of Minneapolis*, 540 N.W.2d 539, 543 (Minn. App. 1995). Plaintiffs' omission-based allegations similarly fail to plead a fraud claim.

## IV. In the absence of an underlying tort, Plaintiffs' conspiracy claim likewise fails as a matter of law.

In Count II (entitled "Civil Conspiracy"), Plaintiffs' Amended Complaint alleges that every defendant—the City, its mayor and city manager, and the attorney, planner, and public finance consultants—"agreed to act in concert and were complicit in wrongfully and illegally destroying Plaintiffs' property rights to develop" the Property. (Am. Compl. ¶ 99.) Referring to all defendants except Casey and Lindgren, the Amended Complaint also characterizes the conspiracy as one "to commit an unlawful act and to accomplish a legal act by illegal means by fraudulently inducing The Village to purchase the property and taking intentional actions to interfere with and destroy the Plaintiffs' rights to develop the real property." (*Id.* ¶ 100.)

There is no such thing as an independent civil action for conspiracy. *Harding v. Ohio Cas. Ins. Co. of Hamilton, Ohio,* 41 N.W.2d 818, 825 (1950). Rather, a civil conspiracy must be based on an underlying tort. *Id.* Because Plaintiffs' fraud claims are defective, and there is no other "underlying tort" to take fraud's place, their "conspiracy count fails." *D.A.B. v. Brown*, 570 N.W.2d 168, 172 (Minn. App. 1997).

Plaintiffs' "civil conspiracy" claim is not salvaged by the Amended Complaint's conclusory assertions that all defendants "agreed to act in concert and were complicit in wrongfully and illegally destroying Plaintiffs' property rights to develop Plaintiff's real estate." (Am. Compl. ¶ 99; *see also id.* ¶ 100). Because of the guide plan and the underlying zoning designation at the time that The Village acquired the site, Plaintiffs had no "property right" to build (or "rights to develop") something on an even grander scale. That is precisely why Plaintiffs applied for two highly-discretionary kinds of approvals after purchasing the Property—a reguiding and a rezoning—when submitting their first development application. *Mendota Golf, LLP v. City of Mendota Heights*, 708 N.W.2d 162, 174 (Minn. 2006) ("Because land use planning and regulation are within a city's legislative prerogative, the city has broad discretion when it makes decisions in that arena."); *State, by Rochester Ass'n of Neighborhoods v. City of Rochester*, 268 N.W.2d 885, 889 (Minn. 1978) ("In passing a zoning or rezoning ordinance, a city council is required to make a legislative judgment that a certain zoning classification will promote the 'public health, safety, morals and general welfare.'" (quoting Minn. Stat. § 462.357, subd. 1)). Defendants thus cannot be liable for conspiring to deprive Plaintiffs of a "property right" that did not exist.

## CONCLUSION

For all of the foregoing reasons, Defendants City of St. Anthony Village, Mark Casey, and Jerry Faust respectfully request that this Court grant judgment in their favor and dismiss Plaintiffs' Amended Complaint against them.


Dated:  November 2, 2018                    **GREENE ESPEL PLLP**


                                             s/John M. Baker
                                            _____
                                            John M. Baker, Reg. No. 0174403
                                            Caitlinrose H. Fisher, Reg. No. 0398358
                                            222 S. Ninth Street, Suite 2200
                                            Minneapolis, MN  55402
                                            jbaker@greeneespel.com
                                            cfisher@greeneespel.com
                                            (612) 373-0830

                                            Attorneys for Defendants City of St.
                                            Anthony Village, Mark Casey, and Jerry
                                            Faust