UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| BRADLEY A. HOYT and THE VILLAGE, LLC, a Minnesota Limited Liability Company, | Case No. 18-CV-2434 (PJS/ECW) |
| Plaintiffs, | |
| v. | ORDER |
| THE CITY OF ST. ANTHONY VILLAGE; MARK CASEY; JERRY FAUST; BREANNE ROTHSTEIN; WSB & ASSOCIATES, INC., a Minnesota corporation; STACIE KVILVANG; EHLERS & ASSOCIATES, INC., a Minnesota corporation; and  JAY R. LINDGREN, | |
| Defendants. | |

---

Samuel M. Johnson and William R. Skolnick, SKOLNICK & JOYCE, P.A., for plaintiffs.

John M. Baker and Caitlinrose H. Fisher, GREENE ESPEL PLLP, for defendants City of St. Anthony Village, Mark Casey, and Jerry Faust.

Valerie Sims, Mark J. Heley, and Elizabeth P. Ridley, HELEY, DUNCAN & MELANDER, PLLP, for defendants Breanne Rothstein and WSB & Associates, Inc.

James J. Thomson, Peter G. Mikhail, and Elizabeth C. Brodeen-Kuo, KENNEDY & GRAVEN, CHARTERED, for defendants Stacie Kvilvang and Ehlers & Associates, Inc.

Peter M. Lancaster and Ken Jorgensen, DORSEY & WHITNEY LLP, for defendant Jay R. Lindgren.

Plaintiff Bradley Hoyt is a property developer; plaintiff The Village, LLC ("The Village") is one of Hoyt's companies. The Village purchased a dilapidated mobile-home park in defendant City of St. Anthony Village ("City") with the intention of replacing it with high-density housing. Hoyt eventually concluded that he needed tax-increment financing ("TIF") to make the project work. City officials were generally supportive of Hoyt's plans, but an outside analysis commissioned by the City concluded that TIF was unnecessary. The advice of the outside analyst is not binding on the City—and the City has not yet decided whether it will provide TIF—but Hoyt and The Village have nevertheless filed this action against the City, various city officials, and other individuals involved in the process, claiming a wide-ranging fraud and civil conspiracy as well as violations of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 et seq., and the Equal Protection Clause.

This matter is before the Court on various defense motions to dismiss or for judgment on the pleadings. For the reasons that follow, the motions are granted and the Court dismisses the amended complaint without prejudice.

## I. BACKGROUND[1]

Continental Property Group ("CPG") signed a letter of intent to purchase the mobile-home park and then assigned its interest in the park to The Village. Am. Compl.

---

[1]The Court has done its best to make sense of plaintiffs' allegations, but the amended complaint is difficult to follow.

¶¶ 27, 29.  On February 1, 2016, Hoyt and other representatives of The Village met with

defendants Mark Casey (the city manager) and Breanne Rothstein (the city planner[2]) to

inform them of the letter of intent and discuss the proposed redevelopment of the site.

Am. Compl. ¶¶ 28-29.  Casey and Rothstein told Hoyt that the City wanted him to have

"maximum flexibility" and would not place any limitations on the proposal.  Am.

Compl. ¶ 29.  They also said "the more density the better."  Am. Compl. ¶ 29.  Casey

and Rothstein made similar remarks at other meetings with Hoyt and his associates.

Am. Compl. ¶¶ 30, 34, 54.

On April 27, 2016, The Village signed a $6 million purchase agreement for the

mobile-home park.  Am. Compl. ¶ 31.  The sale closed on June 13, 2016.  Am. Compl.

¶¶ 34, 49-50.  At the time, there were 95 occupied homes in the park.  Am. Compl. ¶ 16.

Shortly after the sale closed, park residents and Aeon (an affordable-housing developer)

filed a lawsuit against The Village.  Am. Compl. ¶ 51.  As described below, the suit was

settled at some point in 2017.  Am. Compl. ¶ 66.

A high-density development (such as the development planned by plaintiffs)

requires an Environmental Assessment Worksheet ("EAW").  Am. Compl. ¶ 35.  The

Village accordingly submitted a sketch plan with the preliminary information necessary

for preparing an EAW.  Am. Comp. ¶ 35.  The sketch plan envisioned a total of 837

---

[2]Rothstein is employed by defendant WSB & Associates, Inc. ("WSB"), which
provides professional engineering services to the City.  Am. Compl. ¶¶ 9-10, 58.

units, or about 54 units per acre.  That exceeded the 40-units-per-acre limitation that was set forth in the City's 2008 Comprehensive Plan.  Am. Compl. ¶¶ 35, 40, 69.  About 90 of the proposed units met the federal affordable-housing standard.  Am. Compl. ¶ 35.

The City's planning commission held a hearing on the sketch plan in October 2016 and did not raise any concerns.  Am. Compl. ¶ 36.  Rothstein then prepared an EAW, which found no negative environmental impact and hence no need for an Environmental Impact Study ("EIS").  Am. Compl. ¶¶ 37-38, 56-57.  The EAW was presented to the City Council in February 2017, and the City Council agreed that no EIS was necessary.  Am. Compl. ¶ 43.

In February 2017, City staff identified stormwater management as an area of concern regarding the project.  Am. Compl. ¶ 44.  Representatives from The Village met with City staff and proposed revisions to address the issue.  Am. Compl. ¶¶ 45, 63.  To accommodate the revisions, The Village entered into a purchase agreement for an adjoining site.[3]  Am. Compl. ¶¶ 46, 64.  In a May 2, 2017 letter, Rothstein notified plaintiffs that an amendment to the City's 2008 Comprehensive Plan would be necessary if the development included more than 40 units per acre.  The City had

---

[3]Although The Village entered into a purchase agreement and included the adjoining site in the development proposal that it submitted to the City in July 2017, *see* Am. Compl. ¶¶ 64-65, 70, plaintiffs do not allege that The Village ever actually purchased the site.

previously indicated that it could address the issue in the City's 2040 Comprehensive Plan.  Am. Compl. ¶¶ 42, 47.

On June 30, 2017, The Village closed the mobile-home park.  Am. Compl. ¶ 53. The following month, The Village submitted development applications to the City.  Am. Compl. ¶ 65.  The Village's proposal included a separate building that would provide affordable housing.  Am. Compl. ¶ 64.  After The Village submitted its applications, Aeon and the residents of the mobile-home park settled their lawsuit against The Village.  Am. Compl. ¶ 66.  Under the settlement agreement, Aeon was put in charge of developing 100 "deeply affordable" housing units.  Am. Compl. ¶ 67.  In later meetings, the City's mayor (defendant Jerry Faust) told Hoyt that he "hated Aeon," that "Aeon builds shit," and that Aeon would never be allowed to build any affordable housing in the City.  Am. Compl. ¶ 67.

The development plan came before the City Council on October 10, 2017.  Am. Compl. ¶ 70.  As noted, the proposed development called for approximately 54 units per acre.  Before the City Council took up the development plan, Casey presented a resolution limiting the development to 25 units per acre.[4]  Am. Compl. ¶ 70.  The City

---

[4]Defendants deny that the resolution limited the development to 25 units per acre.  As discussed below, the City eventually approved a proposal for a 430-unit development, which is approximately 28 units per acre.

Council then passed a resolution denying the Comprehensive Plan amendments and rejecting the development plan. Am. Compl. ¶ 70.

A week later, Hoyt met with Faust and several other individuals. Am. Compl. ¶ 74. Hoyt told the City that a development limited to 25 units per acre would require TIF to be financially viable. Am. Compl. ¶ 75. Faust agreed that TIF was appropriate and would be available, and defendant Jay Lindgren (the City attorney) added that Hoyt would have to return ten percent of the TIF to the City to cover the City's costs. Am. Compl. ¶ 76. From October 2017 through the spring of 2018, Hoyt continued to discuss TIF with City representatives, and he prepared a revised development proposal. Am. Compl. ¶¶ 77-78, 80. On January 9, 2018, Lindgren confirmed that the City supported the project and that there were no obstacles to obtaining TIF. Am. Compl. ¶ 78.

In February 2018, the City approved The Village's revised proposal, which included 430 units, including 90 to 100 "deeply affordable" units.[5] Am. Compl. ¶ 80. The City retained defendant Stacie Kvilvang, an independent consultant, to prepare a TIF analysis. Am. Compl. ¶ 80. Kvilvang issued a memo concluding that TIF was

_____

[5]The amended complaint does not include details about the new proposal or the timing of the City's approval, but plaintiffs admitted at oral argument that their new proposal was approved in February 2018 and has 430 units, including 90 to 100 "deeply affordable" units.

unnecessary.  Am. Compl. ¶ 81.  Before the City took any action in response to the

memo, Hoyt and The Village filed this lawsuit.

## II.  ANALYSIS

### A.  Standard of Review

Defendants Lindgren, Rothstein, and WSB have filed motions to dismiss; the

remaining defendants have filed motions for judgment on the pleadings.  Motions for

judgment on the pleadings under Fed. R. Civ. P. 12(c) are assessed under the same

standards as motions to dismiss under Fed. R. Civ. P. 12(b)(6).  *Ashley Cty. v. Pfizer, Inc.*,

552 F.3d 659, 665 (8th Cir. 2009).  In reviewing a motion to dismiss for failure to state a

claim under Fed. R. Civ. P. 12(b)(6), a court must accept as true all of the factual

allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.

*Aten v. Scottsdale Ins. Co.*, 511 F.3d 818, 820 (8th Cir. 2008).  Although the factual

allegations need not be detailed, they must be sufficient to "raise a right to relief above

the speculative level . . . ."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The

complaint must "state a claim to relief that is plausible on its face."[6]  *Id.* at 570.

---

[6]Defendants have submitted various public records and other documents
embraced by the complaint in support of their motions.  Plaintiffs object to the Court's
consideration of these documents.  Plaintiffs' objection is meritless.  Nevertheless, the
Court has not found it necessary to consider defendants' documents, and thus has
confined itself to the allegations of plaintiffs' amended complaint (as well as to certain
facts conceded by plaintiffs at oral argument).

*B.  Fraud and Civil Conspiracy*

Plaintiffs bring a claim of fraud against Casey (the city manager), Rothstein (the city planner), and the City, contending that these defendants fraudulently induced plaintiffs to purchase the mobile-home park.  Plaintiffs have also pleaded a civil-conspiracy claim against the remaining defendants, contending that they were part of the fraudulent scheme.  Plaintiffs' theory is that defendants conspired with each other to induce plaintiffs to purchase the site and close the park in order to get rid of minority residents, all the while intending to prevent plaintiffs from constructing a high-density development.

To prevail on a fraud claim, a plaintiff must prove that:

> "(1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer[ed] pecuniary damage as a result of the reliance."

*Hoyt Props., Inc. v. Prod. Res. Grp.*, 736 N.W.2d 313, 318 (Minn. 2007) (quoting *Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 532 (Minn. 1986)).  The plaintiff must demonstrate both actual and reasonable reliance.  *Id.* at 320-21.

In addition, fraud must be pled with particularity.  Fed. R. Civ. P. 9(b); *Munro v. Lucy Activewear, Inc.*, 899 F.3d 585, 590 (8th Cir. 2018).  To satisfy this standard, a plaintiff must allege such matters as "the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby."  *Munro*, 899 F.3d at 590.

Many of plaintiffs' allegations fall short of meeting the particularity standard of Rule 9(b).[7]  The remaining allegations—that is, the allegations that comply with Rule 9(b)'s particularly standard—fall into three general categories: (1) Casey's and Rothstein's statements at the February 1, 2016 meeting with Hoyt; (2) Rothstein's statements in the EAW and the City's statements in the Record of Decision ("ROD") regarding the EAW; and (3) Faust's and Lindgren's October 17, 2017 statements

---

[7]*See, e.g.*, Am. Compl. ¶ 30 (alleging that Casey and Rothstein made certain false representations in "meetings prior to April 27, 2016"); *id.* ¶ 32 (alleging that "staff" and "the City" made certain false representations without specifying time or place); *id.* ¶ 33 (alleging that "staff outlined its intended approach" in an April 26, 2016 email without specifying the author or the contents of the email); *id.* (alleging that "City staff" provided a preliminary analysis without specifying the speaker, date, or contents); *id.* ¶ 34 (alleging that Casey and Rothstein made certain false representations sometime before plaintiffs purchased the property in June 2016); *id.* ¶ 54 (alleging that Casey and Rothstein made certain false representations "[f]rom January 2016 through April 2016"); *id.* ¶ 69 (alleging that "[p]laintiff . . . was told" certain information "[d]uring early meetings" without specifying the speaker, date, or place); *id.* ¶ 77 (alleging that "Faust and other council members" made unspecified "assurances" in "many meetings and communications" between October 17, 2017 through "the Spring of 2018"); *id.* ¶ 79 (alleging that Lindgren said in an email "I also want to confirm that we are on the same page" without any context).

regarding TIF and Lindgren's January 9, 2018 statements regarding TIF and City

support for the project.

The main problem with plaintiffs' fraud claim is that plaintiffs have not plausibly

pleaded that they reasonably relied on any of these statements.  With the exception of

the ROD (which was issued by the City Council), all of the allegedly fraudulent

statements were made by individuals who did not have authority to bind the City.[8]  As

a result, to the extent that plaintiffs relied on these statements, their reliance was

unreasonable as a matter of law.[9]  *See City of Geneseo v. Utils. Plus*, 533 F.3d 608, 617 (8th

Cir. 2008) (reliance on representations by president of municipal joint-powers

organization was unreasonable as a matter of law because that individual had no

authority to bind organization); *Plymouth Foam Prods., Inc. v. City of Becker*, 120 F.3d 153,

157 (8th Cir. 1997) (reliance on city staffer's representations was unreasonable as a

---

[8]At times in the amended complaint, plaintiffs attribute certain statements to "the City" without identifying who was purportedly speaking on behalf of the City.  *See, e.g.*, Am. Compl. ¶¶ 32, 39.  This is insufficient to comply with the particularity requirements of Rule 9(b), especially given that plaintiffs often attribute statements by non-decisionmakers (such as Casey and Rothstein) to "the City."  *See, e.g.*, Am. Compl. ¶¶ 31, 53.  It is therefore impossible to tell whether generic references to statements by "the City" refer to statements by a non-decisionmaker or by the City Council.

[9]In addition to alleging affirmative misrepresentations, plaintiffs also contend that defendants breached a duty to disclose the City's purported true intentions in order to correct the allegedly fraudulent statements.  Because plaintiffs have not plausibly pleaded reasonable reliance on any statements about the City's intentions, they cannot plausibly plead that they reasonably relied on defendants' failure to correct those statements.

matter of law because that individual had no authority to bind the city); *Nicollet Restoration, Inc. v. City of St. Paul*, 533 N.W.2d 845, 848 (Minn. 1995) (reliance on mayor's and city staffer's representations that they would submit a financing proposal to the city council was unreasonable as a matter of law because those individuals had no authority to bind the city and there was no evidence that the city council would have adopted any such proposal).

This is particularly true given Hoyt's status as an experienced developer. *See Hoyt v. Piper Jaffray & Co.*, No. A07-1737, 2008 WL 3289722, at *3 (Minn. Ct. App. Aug. 12, 2008) (describing Hoyt as "an experienced real estate developer and investor"); *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 369 (Minn. 2009) ("Reliance in fraud cases is generally evaluated in the context of the aggrieved party's intelligence, experience, and opportunity to investigate the facts at issue."). Moreover, other than Casey's and Rothstein's February 1, 2016 statements, all of the (sufficiently pleaded) statements were made *after* plaintiffs purchased the mobile-home park.[10] As discussed below, plaintiffs do not explain how they could possibly have relied on such statements in deciding to purchase the property.

The ROD was issued by the City Council—and the City Council obviously had authority to bind the City—but plaintiffs have nevertheless failed to plead that they

---

[10]Notably, plaintiffs negotiated a letter of intent to purchase the mobile-home park before February 1, 2016.

reasonably relied on the ROD.  As noted, the ROD simply memorialized the City

Council's decision regarding the EAW.  An EAW "is a brief document prepared in

worksheet format which is designed to rapidly assess the environmental effects which

may be associated with a proposed project" and whose purpose is to "aid in the

determination of whether an [Environmental Impact Statement ("EIS")] is needed for a

proposed project."  Minn. R. 4410.1000, subp. 1.  An EIS is required "for projects that

have the potential for significant environmental effects."  Minn. R. 4410.1700, subp. 1.

The ROD is thus the City's official decision as to whether an EIS was necessary.

　　　After reviewing the EAW, the City agreed that no EIS was necessary and

accordingly issued an ROD stating (in conformity with the legal standard for

dispensing with an EIS) that "the proposed project does not have the potential for

significant environmental effects."  Am. Compl. ¶ 41; *cf.* Minn. R. 4410.1700, subp. 1.

The ROD also pointed out that, although "the project fits within the spirit of high

density residential zoning" and the "land use is compatible with the Comprehensive

Plan," the proposed density was greater than the Plan's description of "High Density

Residential."  Am. Compl. ¶ 40.  According to plaintiffs, however, the ROD "repeatedly

emphasize[d] that the City's response will be to change the language of the updated

Comprehensive Plan to make the plan consistent with the proposed project."  Am.

Compl. ¶ 42.

Plaintiffs do not plausibly allege that they *actually* relied on these statements, much less that they *reasonably* relied on them.  At the time that the City issued the ROD, plaintiffs had already purchased the property and were well into the development process.  Plaintiffs point out that they closed the mobile-home park in June 2017 (which was after the ROD was issued) and that they continued to incur carrying costs and other expenses.  But long before the ROD was issued, plaintiffs had spent $6 million to purchase the property for the express purpose of redeveloping the site.  Closing the mobile-home park and incurring various expenses were necessary and expected parts of that process.  In addition, plaintiffs do not explain how the closure of the park damaged them in any way—that is, how they would be better off today if they had left a run-down mobile-home park in place.  Nor do they explain how the alleged misrepresentations in the ROD caused them to incur any expenses that they would not otherwise have incurred; in particular, plaintiffs do not explain what alternative course of action they would have taken in the absence of the alleged misrepresentations in the ROD.

Moreover, any such reliance would have been unreasonable as a matter of law.  Again, Hoyt is an experienced developer.  An experienced developer would know that an ROD serves the narrow function of recording a municipality's decision regarding the need for an EIS.  An experienced developer could not reasonably read statements in an

ROD as somehow granting approval for a development project; indeed, state law

forbids local governments from approving a project until after they have made a final

determination as to the need for an EAW and then, if an EAW is required, a final

determination as to the need for an EIS.  *See* Minn. Stat. § 116D.04, subd. 2(b).  Because

plaintiffs have not plausibly pleaded reasonable reliance, their fraud claims must be

dismissed.

Finally, setting aside the issue of reliance, it is worth noting that plaintiffs' fraud

theory runs aground on the fact that the City *approved* plaintiffs' second development

proposal, which includes 430 units, of which 90 to 100 are "deeply affordable."  In other

words, the number of "deeply affordable" units in the proposal approved by the City is

roughly the same as the number of occupied units that plaintiffs cleared from the

mobile-home park.  Again, plaintiffs' lawsuit is premised on the theory that defendants

conspired with each other to mislead plaintiffs into believing that the City would

approve a high-density housing development in order to induce plaintiffs to purchase

and clear the mobile-home park, all because the City wanted to rid itself of low-income

housing and the minority residents who disproportionately reside in such housing.

Given that the City eventually approved a high-density development with a

substantial amount of affordable housing, plaintiffs' claim ultimately comes down to

their contention that the City is attempting to undermine the project that it approved by

denying TIF.  One of the many problems with this theory is that the City has not

actually denied plaintiffs' request for TIF.  Plaintiffs sued the City not because it denied

TIF, but because an outside consultant wrote a report that advised the City that, in her

opinion, TIF is unnecessary.  Plaintiffs have every right to disagree with that analysis,

but their claim that the consultant was part of a years-long conspiracy to defraud

plaintiffs is absurd—and, not surprisingly, unsupported by a single plausible factual

allegation.  *Cf. Bell Atl. Corp.*, 550 U.S. at 556 ("an allegation of parallel conduct and a

bare assertion of conspiracy will not suffice" to state an antitrust claim).

The Court therefore grants defendants' motions as to plaintiffs' fraud claim.  The

Court also grants defendants' motions as to plaintiffs' conspiracy claim.  As plaintiffs

conceded at oral argument, if their fraud claim is insufficient, their conspiracy claim is

insufficient as well.

### C.  Equal Protection

To state a plausible claim under the Equal Protection Clause, a plaintiff must

identify a similarly situated comparator who was treated more favorably.  *See In re*

*Kemp*, 894 F.3d 900, 909-10 (8th Cir. 2018), *cert. denied*, 139 S. Ct. 1176 (2019).  Plaintiffs

have not identified *any* comparator, much less a similarly situated one.  As a result, they

have failed to plead a plausible Equal Protection claim.  *See id.*  The Court therefore

grants the City's motion for judgment on the pleadings as to this claim.

### D.  Fair Housing Act

The FHA "prohibits property owners and municipalities from blocking or impeding the provision of housing on the basis of race, color, religion, sex, familial status, or national origin."  *Gallagher v. Magner*, 619 F.3d 823, 831 (8th Cir. 2010), *cert. dismissed*, 565 U.S. 1187 (2012).  Plaintiffs bring both a disparate-treatment claim and a disparate-impact claim under the FHA.  *See id.* (discussing disparate-treatment claims under the FHA); *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2522 (2015) (holding that disparate-impact claims are cognizable under the FHA).  The Court considers each in turn.

### 1.  Disparate Treatment

To state a claim of disparate treatment under the FHA, plaintiffs must plausibly allege that defendants acted with discriminatory intent.[11]  *See Ellis v. City of Minneapolis*, 860 F.3d 1106, 1112 n.3 (8th Cir. 2017) ("the Ellises do not allege any facts suggesting that individuals protected under the FHA were treated inconsistently 'because of' a protected characteristic" (quoting 42 U.S.C. § 3604(a))).  Plaintiffs' purely conclusory allegations fall far short of this standard.  *See* ECF No. 48 at 16-17 (plaintiffs' memorandum relying on such allegations as "it was the City's intent to deny dwellings

---

[11]In "'rare'" cases, a "'stark'" pattern of discriminatory effects may be sufficient to establish a discriminatory purpose.  *See Gallagher*, 619 F.3d at 833 (quoting *Vill. of Arlington Heights v. Metro. Dev. Corp.*, 429 U.S. 252, 266 (1977)).  Plaintiffs have not alleged any such pattern.

to persons . . . on account of their income and race/national origin" and "The City

wanted the mobile home park closed to rid the City of low income residents of color

and diversity").  As discussed above, plaintiffs do not identify any similarly situated

comparators who were treated more favorably, nor do they allege any other facts that

would give rise to an inference of discriminatory intent.

The closest plaintiffs come is an allegation that Faust (the mayor) made negative

comments about Aeon (the affordable-housing developer).  But the alleged comments

concerned Faust's opinion of the quality of Aeon's work and had nothing to do with

race, religion, or any other protected characteristic.  *See Gallagher*, 619 F.3d at 832

("Facially race-neutral statements, without more, do not demonstrate racial animus on

the part of the speaker." (citation and quotation marks omitted)).  Moreover, as

discussed above, the City approved a plan that provides as much affordable housing as

previously existed in the mobile-home park.  Under these circumstances, Faust's

comments are an insufficient basis for a disparate-treatment claim.  The Court therefore

grants the City defendants' motion with respect to plaintiffs' disparate-treatment claim.

## 2.  Disparate Impact

To plead a plausible disparate-impact claim, a plaintiff must plead the existence

of an "'artificial, arbitrary, and unnecessary'" governmental policy and allege facts that

demonstrate a causal connection between that policy and a disproportionately adverse

impact on a class protected under the FHA.  *Ellis*, 860 F.3d at 1112-14 (quoting *Inclusive Communities Project, Inc.*, 135 S. Ct. at 2522).  It is not sufficient to simply identify a policy and conclusorily allege that it is arbitrary and unnecessary.  Instead, a plaintiff "must . . . allege *facts* plausibly demonstrating that the [policies] complained of are arbitrary and unnecessary under the FHA."  *Id.* at 1112 (emphasis added).

Plaintiffs' amended complaint fails to plausibly allege either of these elements—that is, it fails to plausibly allege that the City adopted an arbitrary and unnecessary policy, and it fails to plausibly allege that such a policy had a disproportionately adverse impact on a protected class.  Plaintiffs point to the City's 2008 Comprehensive Plan, which identified the mobile-home park as a target for redevelopment.  But this allegation fails to satisfy *Inclusive Communities* for several reasons.  To begin with, plaintiffs do not point to any language in the 2008 Comprehensive Plan (or any other City document) indicating that the City has a *policy* of restricting affordable housing.[12]  Instead, the amended complaint points to specific decisions made about a particular mobile-home park and contends that those decisions amount to a "policy" of restricting affordable housing.  A limited set of decisions concerning one specific site does not plausibly establish the existence of a City policy.

---

[12]Indeed, the existence of such a policy in the 2008 Comprehensive Plan would completely undermine plaintiffs' fraud claim.

Even if these decisions did amount to a "policy," plaintiffs have failed to offer "factually supported allegations" that any of the City's decisions with respect to the property were "arbitrary or unnecessary to health and safety." *Ellis*, 860 F.3d at 1112. This includes the City Council resolution that allegedly limited the development to 25 units per acre,[13] which plaintiffs identified at oral argument as a policy that causes an unlawful disparate impact. Again, a one-time site-specific limitation[14] is not a "policy"—but even if it was, plaintiffs do not allege any facts that would show that it is an arbitrary and unnecessary policy.

Finally, plaintiffs do not plausibly allege that the City's actions will have a disparate impact. To the contrary, plaintiffs' most recent proposal—which, again, was approved by the City—contains as much affordable housing as the mobile-home park that it will replace. Once again, plaintiffs' complaint rests on their prediction that the City will deny TIF, which plaintiffs contend is necessary for their most recent proposal to be economically feasible. Again, however, plaintiffs' complaint is premature, as the City has not yet acted on plaintiffs' request for TIF. Moreover, plaintiffs have not alleged any facts showing that TIF is necessary or (to put it in terms relevant to their

---

[13]As noted, defendants deny that the City imposed a 25-unit limit and have submitted a copy of the resolution at issue. The Court need not consider it, however, as plaintiffs' argument fails on its own terms.

[14]The amended complaint is unclear on this point, but plaintiffs admitted at oral argument that this alleged limitation is site specific.

FHA claim) that a denial of TIF in this case would constitute an arbitrary and unnecessary policy rather than an isolated decision about a specific site. Because plaintiffs have failed to allege the existence of an arbitrary and unnecessary City policy that has caused a disparate impact, the Court grants the City defendants' motion with respect to plaintiffs' disparate-impact claim.

### E.  Request to Amend Complaint

Plaintiffs ask for leave to amend their complaint in the event that the Court grants any of defendants' motions. Plaintiffs have not submitted a copy of a proposed amended pleading, however. *See* D. Minn. L.R. 15.1(b). Indeed, they have not even identified any additional factual allegations that they are prepared to make that would render their claims plausible. The Court accordingly denies their request. *See O'Neil v. Simplicity, Inc.*, 574 F.3d 501, 505 (8th Cir. 2009) (affirming denial of request to amend where plaintiffs failed to submit a proposed amended pleading as required by D. Minn. L.R. 15.1(b)); *Meehan v. United Consumers Club Franchising Corp.*, 312 F.3d 909, 913-14 (8th Cir. 2002) (affirming denial of request to amend where plaintiff "failed to specify the proposed new allegations").

### ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.   Defendants' motions to dismiss or for judgment on the pleadings [ECF Nos. 20, 31, 37, 42] are GRANTED.

2.   Plaintiffs' amended complaint [ECF No. 12] is DISMISSED WITHOUT PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  May 20, 2019                              s/Patrick J. Schiltz
                                                  Patrick J. Schiltz
                                                  United States District Judge